733 So.2d 1198 (1999)
Fred PETERSON
v.
GIBRALTAR SAVINGS AND LOAN, Club West, Inc., The Galleria Investment Corporation, d/b/a Galleria One and/or The Galleria, et al.
Nos. 98-C-1601, 98-C-1609.
Supreme Court of Louisiana.
May 18, 1999.
*1200 Arthur W. Landry, Luther F. Cole, Plauche, Maselli, Landry & Parkerson, New Orleans, Counsel for Applicant in No. 98-C-1601.
Alden B. Netterville, Harry E. Cantrell, Jr., O'Neill, Netterville & Burton, Gretna, Edgar John Litchfield, Alphonse M. Thompson, Jr., Andre Philip Guichard, Pike Hall, Jr., Paul M. Adkins, Blanchard, Walker O'Quin & Roberts, Shreveport, Counsel for Respondent in No. 98-C-1601.
Edgar John Litchfield, Alphonse M. Thompson, Jr., Pike Hall, Jr., Paul M. Adkins, Blanchard, Walker, O'Quin & Roberts, Shreveport, Counsel for Applicant in No. 98-C-1609.
Arthur W. Landry, Luther F. Cole, Plauche, Maselli, Landry & Parkerson, New Orleans, Alden B. Netterville, Harry E. Cantrell, Jr., O'Neill, Netterville & Burton, Andre Philip Guichard, Counsel for Respondent in No. 98-C-1609.
JOHNSON, Justice.[*]
This action was brought by plaintiff to recover damages he sustained when he was abducted from a Jefferson Parish parking garage. We granted this writ of certiorari to determine whether the court of appeal erred in overturning the jury's determination that defendants did not breach their duties to provide adequate security. After a thorough review of the record, we conclude that the court of appeal failed to apply the manifest error standard of review, and thus erred in reversing the jury's verdict in favor of defendants and the trial court's denial of plaintiff's motion for judgment notwithstanding the verdict. Accordingly, we reverse the court of appeal's decision and reinstate the judgment of the trial court.

FACTS AND PROCEDURAL HISTORY
On the evening of May 19, 1988, plaintiff, Fred Peterson and a friend, Wendy Whiteman, drove to a nightclub, Club Galleria West (hereinafter "Club West"), which was located in the Galleria Mall in Metairie, Louisiana. When they arrived at the Galleria, Ms. Whiteman, who was familiar with the garage, parked on the first floor of the 600,00 square foot, six level parking garage adjacent to the Galleria. Ms. Whiteman was employed by General Motors Acceptance Corporation, one of the businesses located in the Galleria.
Plaintiff testified that during the course of the evening, he mingled with the crowd, talked to friends, and drank approximately six (6) beers. At some point, he became separated from Ms. Whiteman, and when he was ready to leave the nightclub, he could not find her. Plaintiff testified that he left the nightclub at 1:00 a.m. and went into the parking garage to see if Ms. Whiteman's car was still parked there. Plaintiff testified that, while in the parking garage, he was confronted by two black men, dressed in blue jeans and tee shirts, who forced him into their vehicle at gunpoint and took him to a building in New Orleans. Plaintiff further testified that the alleged abductors beat him with a pipe, stole his wallet and his jewelry, forced him to remove his clothes, and at least one of them sodomized him. After holding him for an indeterminate period of time, the two men drove him to another location and put him out of the car.
Plaintiff testified that, after wandering around the unfamiliar location, he came upon an area he recognized as Uptown Square. He saw a security guard, but he did not report the incident to the guard. The security guard allowed plaintiff to use the telephone, and he called his mother, who came and picked him up and took him to the hospital.
Plaintiff arrived at the emergency room at Charity Hospital in New Orleans on May 20, 1988 at approximately 10:00 a.m. He reported to the hospital staff that around midnight the previous night, he had been "attacked by two black men who held him at gunpoint" and raped him. The *1201 emergency room records reveal that plaintiff had multiple abrasions on his torso and a hematoma near his anus. The rectal examination did not reveal any signs of bleeding or semen in plaintiff's rectum.
There were no witnesses to the abduction, and the alleged perpetrators have never been apprehended. The testimony at trial indicated that plaintiff never fully cooperated with the police investigation of the incident. Charity Hospital contacted the New Orleans Police Department, who sent Officer Vivian Williams to investigate the alleged rape. Plaintiff testified that he did not want to talk to Officer Williams "because she was black" and because it was difficult to talk to a female about the incident. Detective Dennis Thornton of the Jefferson Parish Sheriff's Office testified that plaintiff declined his offer to go riding to look for the house where the alleged incident occurred.
On May 5, 1992, plaintiff donated blood to The Blood Center for Southeast Louisiana's blood program. By letter dated June 8, 1992, The Blood Center notified plaintiff that his donation could not be used for transfusion because his HIV antibody test was positive. Plaintiff contends that he contracted the virus in 1988 when he was sodomized by the two unidentified men. Plaintiff testified that he had donated blood in 1986 and, to his knowledge, he was not HIV positive at that time. He denied being tested for the virus between 1986 and 1992. He also denied ever having homosexual activity with a male, other than one of the attackers, receiving any blood or blood products, having sexual intercourse with prostitutes, or using intravenous drugs.
Plaintiff filed suit against Gibraltar Savings and Loan, Club Galleria West, Inc., and The Galleria Investment Corporation, doing business as Galleria One and/or The Galleria. Plaintiff later amended his petition to add Metairie Center Land Development, Ltd., Galleria Land, Ltd., F.G.M.C. Investment Corporation, F.G.M.C. Ltd., First Gibraltar Mortgage, Corp., Inc. Metairie Center Phase One, Metairie Center Phase One, Ltd., Metairie Center Joint Venture, Metairie Center Land Joint Venture, Galleria Phase One, Ltd., and Metairie Corporation of Texas as defendants (these defendants will hereinafter be referred to collectively as "the Gibraltar defendants"). Plaintiff also named the unknown assailants as defendants, referring to them as "John Doe" and "Charles Roe," who were never identified or served. Plaintiff alleged that the Gibraltar defendants breached their duty by 1) failing to provide adequate security personnel; 2) failing to provide a sufficient number of security personnel; 3) failing to provide adequate security equipment; 4) failing to post warning signs; 5) failing to provide adequate security; 6) failing to provide adequate security training; 7) failing to provide a safe place of business.
The Gibraltar defendants filed a third-party demand, naming New Orleans Private Patrol Service, Inc. (hereinafter "NOPPS") and its insurer as third-party defendants. Gibraltar alleged that NOPPS, the company that contracted with Metairie Center to provide security services, failed to provide adequate security. Plaintiff amended his petition again to name NOPPS and its insurer as defendants.
The case was tried by jury. After a seven day trial, the jury found that plaintiff was abducted from the Galleria parking garage.[2] However, the jury found that Gibraltar did not breach its duty to provide a reasonably safe parking area for its patrons. The jury also found that NOPPS did not breach its duty to discharge its security obligations in a reasonable and prudent manner. The trial court ratified the jury's verdict by signing the judgment on January 13, 1997. Plaintiff's motion for new trial and judgment notwithstanding *1202 the verdict (JNOV) was denied on April 23, 1997.
Plaintiff appealed the trial court's judgment, and the court of appeal reversed the trial court's denial of plaintiffs motion for JNOV and rendered judgment in favor of plaintiff. The court of appeal held that the security measures undertaken by the Gibraltar defendants were unreasonable and that NOPPS breached its duty to perform security services in a nonnegligent manner. The court apportioned 80% of the fault to Gibraltar Savings and Loan, Gibraltar Savings, F.G.M.C. Investment Corporation, F.G.M.C., Ltd., Metairie Center Phase One, Metairie Center Phase One, Ltd., and Reliance Insurance Company. NOPPS was held liable for 20% of the damages.[3] Plaintiff was awarded $4,364,333 in damages, plus judicial interest, court costs, and expert witness fees.[4] See Peterson v. Gibraltar Savings and Loan, et al., 97-725 (La.App. 5 Cir., 2/20/98); 711 So.2d 703. The court of appeal denied defendants' application for rehearing. The Gibraltar defendants and NOPPS filed separate applications for certiorari with this court, and by orders dated November 13, 1998, we granted both applications. Peterson, v. Gibraltar Savings and Loan, et al., 98-1601 (La.11/13/98), 728 So.2d 873, 1998 WL 958925(La.); 98-1609 (La.11/13/98), 728 So.2d 873, 1998 WL 958926(La.).

DISCUSSION

Motion to Strike Applications for Writ of Certiorari
In response to the Gibraltar defendants' application for writ of certiorari, plaintiff filed a motion to strike the pleading based upon Gibraltar's failure to disclose the existence of a $10,000,000 excess insurance policy. During the trial, Gibraltar's insurer, Reliance Insurance Company introduced the $1,000,000 base policy into evidence; however, it did not disclose the existence of the excess policy until after the court of appeal rendered a $4.3 million judgment against it.
This court has never dealt with the issue of whether dismissal of a writ application is the appropriate sanction for a litigant's failure or refusal to disclose the existence of an insurance policy. Article 1471 of the Louisiana Code of Civil Procedure provides for sanctions for a party's failure to comply with a court order compelling discovery. In the instant case, as defendants point out, there was no order compelling discovery. Defendants failed to fully comply with plaintiffs request for discovery. Plaintiffs, unaware that there was another policy in existence, did not seek an order to compel disclosure.
Although article 1471 is not exactly on point, it does allow the remedy that plaintiff is seeking, i.e., "striking out pleadings or parts thereof" and/or "dismissing the action or proceeding or any part thereof." However, courts have been reluctant to dismiss actions as a sanction for failure to comply with discovery. This court has held that, because discovery sanctions of dismissal or default involve property rights, those sanctions are generally reserved for the most culpable conduct. See Horton v. McCary, 93-2315, (La. 4/11/94), 635 So.2d 199; reh'ing denied.
While there are no state cases to guide us in determining the appropriate remedy for failure to disclose an insurance policy, the United States Court of Appeals, 5th Circuit, has dealt with a similar issue. In *1203 Crowe, et al. v. Smith, et al., 151 F.3d 217 (5th Cir.1998), after a civil action was settled, it was discovered that defendants' attorneys had failed to disclose an applicable insurance policy issued to defendant. The United States District Court for the Western District of Louisiana did not dismiss the action, but rather imposed sanctions consisting of fines, reprimands, and attorney discipline. Although the Court of Appeal reversed in part, affirmed in part, and remanded with instructions, dismissing the action or striking the pleadings was never an option.
After reviewing the parties' briefs and oral arguments, we find that the dismissal of the Gibraltar defendants' application for writ of certiorari is not the appropriate remedy for defendants' actions. Therefore, we will review this case on its merits.

Motion for JNOV
The court of appeal used JNOV as the procedural mechanism to overturn the jury's verdict and to render judgment in favor of plaintiff. The appellate court reversed the trial court's denial of plaintiffs motion for judgment notwithstanding the verdict (JNOV), holding that the Gibraltar defendants were liable because the security measures undertaken by them were not reasonable. The appellate court also found that NOPPS was negligent in its performance of its security duties.
JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, is so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986). Refusal to render a judgment notwithstanding the verdict (JNOV) can only be overturned if it is manifestly erroneous. Delaney v. Whitney National Bank, 96-2144, 97-0254 (La.App. 4 Cir. 11/12/97), 703 So.2d 709; writ denied 98-0123 (La.3/20/98), 715 So.2d 1211.

Standard of Review
A jury's finding of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 92-1328 (La.4/12/93), 617 So.2d 880. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one, Id. The reviewing court must always keep in mind that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Stobart at 882-83, citing Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).

Duty-Risk
Louisiana courts have adopted a duty-risk analysis to determine whether a party is liable for negligence under the facts of a particular case. Under the dutyrisk analysis, in order to prevail in a negligence action, a plaintiff must prove:
1) the conduct in question was the cause-in-fact of the resulting harm;
2) defendant owed a duty of care to plaintiff;
3) the requisite duty was breached by the defendant;

*1204 4) the risk of harm was within the scope of protection afforded by the duty breached
Mundy v. The Department of Health and Human Resources, et al., 92-3251 (La.6/17/93), 620 So.2d 811; Faucheaux v. Terrebonne Consolidated Government, 92-0930 (La.2/22/93), 615 So.2d 289, rehearing denied 3/25/93; Mart v. Hill, 86-2191, 86-2200, (La. 4/16/87), 505 So.2d 1120, rehearing denied 5/28/87; Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962).
Whether a duty is owed is a question of law. Faucheaux, 615 So.2d at 292. In general, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. St. Hill v. Tabor, 542 So.2d 499, 502 (La.1989); Harris v. Pizza Hut of Louisiana, 455 So.2d 1364 (La.1984). A business establishment is under a duty to take reasonable care for the safety of its patrons, but is not the insurer of their safety. Phillips v. Equitable Life Assurance Company of the United States, 413 So.2d 696 (La.App. 4th Cir.1982), writ denied, 420 So.2d 164 (La.1982). This duty does not extend to unforeseeable or unanticipated criminal acts by independent third persons. Coblentz v. North Peters Parking, Inc., et al., 533 So.2d 98 (La.App. 4 Cir., 1988); Banks v. Hyatt Corporation., 722 F.2d 214 (5th Cir.1984); Rodriguez v. New Orleans Public Service, Inc., 400 So.2d 884 (La.1981). When a duty to protect others against criminal misconduct has been assumed, liability may be created by a negligent breach of that duty. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). Whether a defendant has breached a duty is a question of fact. Mundy at 813; Annis v. Shapiro, 517 So.2d 1237 (La.App. 5 Cir.1987).

THE GIBRALTAR DEFENDANTS
At the trial on the merits, Mike Hilferty, the property manager of the Galleria at the time of the incident, outlined the Galleria's security plan. Hilferty testified that on Club West's busy nights, the Galleria had at least two security officers from NOPPS, as well as at least two additional armed deputies from the Jefferson Parish Sheriffs Office. On the night in question, there were three NOPPS guards assigned to the parking garage. One guard patrolled the garage on foot; one guard patrolled in a truck with flashing lights on top; and the third guard was assigned to the security hut located on the first level of the garage. Additional NOPPS guards, as well as two Jefferson Parish deputies, were stationed inside of the Galleria.[5] Hilferty also testified that the parking garage contained security cameras in the elevator lobbies, with monitors in the security hut. There was a security guard in the hut at all times to watch the monitors. He further stated that, although the original design of the parking garage included control access booths, the booths had never been serviceable and were subsequently removed.
The court of appeal concluded that the Gibraltar defendants were negligent because their security plan was substandard. That conclusion primarily stemmed from the testimony of plaintiffs witness, John Lombardi, an expert in criminology and security who testified that the garage's security plan was inadequate and/or substandard.
One of the reasons Lombardi gave for his conclusion that the plan was inadequate was that the plan was not in writing. Hilferty's testimony outlining the Galleria's security plan contradicts Lombardi's testimony that a written security plan was necessary in order for the security to be deemed adequate. The security measures adopted by the Gibraltar defendants, written or unwritten, demonstrate that a comprehensive *1205 security plan was in effect. The fact that the plan was not in writing is of no moment. There is no legal requirement that an effective security plan must be in writing.
Lombardi also testified that security at the Galleria was substandard because the parking garage did not have controlled access and the guards were not visible. Richard Condon, an expert in the fields of security and criminology, testified for the defense and directly contradicted Lombardi's testimony. Condon testified that it is not feasible for an establishment such as the Galleria to have an access control gate to the parking garage. Inside the Galleria was an eight-screen movie theater, a game room, a food court, and a nightclub. Two floors of the structure contained businesses. Condon stated that the nature of the Galleria mandates that the garage be open to promote the free flow of traffic. Condon further stated that the purpose of a controlled access is not to provide security, but to raise revenue. In fact, even Lombardi admitted that the Protection of Assets Manual ("POA"), the widely accepted reference for those in the security industry, states that vehicular access controls have limited security value. According to the POA, such controls are not feasible for public places like shopping malls and movie theaters. The POA further states that, although access controls may deter casual or random vandalism, they do not deter serious criminals.
Lombardi's assertion that the guards were not visible was also contradicted. Testimony revealed that three uniformed security guards were on duty in the parking garage on the night in question. One of the guards drove through the garage in a red truck with flashing lights on top. One guard remained in the security hut which was located on the first level of the garage. The third guard patrolled the garage on foot.
Lombardi further testified that from January 1, 1988 and May 20, 1988, there were 87 calls for emergency assistance from the area surrounding the Galleria, and these incidents should have alerted Galleria's management that the security plan needed to be re-formatted. After analyzing the calls for emergency assistance referred to by Lombardi, Condon testified that none of the incidents were of a violent nature.[6] Lombardi admitted that he did not know whether the incidents included in the statistics occurred inside of the Galleria, in the parking garage, on the street in front of the Galleria, or at the apartment complex next door to the Galleria. The only serious incident included in the statistics did not occur at the Galleria nor in the parking garage. It involved an aggravated assault in which a resident of the nearby apartment complex came out on his balcony with a gun in his hand after a janitor had made noise by dumping trash in a dumpster.
To support his assertion that the attack against him was foreseeable, plaintiff cites Romaguera v. Piccadilly Cafeterias, Inc., 94-374 (La.App. 5 Cir. 12/14/94), 648 So.2d 1000. In Romaguera, a restaurant patron was shot by an unknown assailant in the parking lot of the restaurant. The appellate court held that the harm to the plaintiff was foreseeable because there had been a previous armed robbery attempt inside of the restaurant. Therefore, the restaurant should have realized that a robbery attempt would occur outside the restaurant in the parking area where there were fewer people around.
After reviewing all of the 9-1-1 calls from the area surrounding the Galleria, the record does not support a finding that the Galleria knew or should have known that the garage posed an unreasonable *1206 risk of harm to anyone using it. There was no way that the Galleria could have foreseen that a violent crime, such as an abduction at gunpoint, would occur on its premises. The only prior incidents consisted of vandalism and theft. There had been no history of crimes against persons either inside of the Galleria or outside in the parking garage.
After reviewing the record in its entirety, we cannot say that the jury's determination that the Gibraltar defendants did not breach their duty to plaintiff was an unreasonable one. The jury was presented with two permissible views of whether or not Gibraltar's security plan was reasonable. Apparently the jury was not persuaded that the lack of access controls was the cause of plaintiff's abduction, or that the abduction was foreseeable. The court of appeal misapplied the manifest error standard of review by re-weighing the evidence and substituting its judgment for that of the jury. Therefore, we hold that the court of appeal erred in reversing the jury's verdict and rendering judgment in favor of plaintiff.

NOPPS
The court of appeal's conclusion that NOPPS breached its duty to perform the garage security in a non-negligent manner was based primarily upon a missing entry in the security log. The guards patrolling the parking garage on foot and by truck were responsible for communicating with the guard stationed in the security hut. The log dated May 19, 1988 reflected that the guards called in on an average of every thirty (30) minutes, and an entry was noted on the log. However, there was no entry documented for 1:00 a.m. Lombardi testified that the only conclusion that could be drawn from the missing entry was that the guards had abandoned their posts, leaving the parking garage unsecured. He went on to state that, had the guards been patrolling, they would have seen the two men seated in the parked vehicle and challenged them regarding their purpose for being in the garage. Furthermore, the guards' presence would have deterred the assailants, and the plaintiff would not have been abducted.
After reviewing the testimony, Lombardi's assertion that the guards would have seen the two assailants had the guards been patrolling the garage seems illogical. Wendy Whiteman testified that Club West was still crowded when she left around 1:00 a.m. She admitted that there was a steady "flow of traffic coming in and out of the building going to the club" around that time. Other testimony shows that on the night in question, there were approximately 2,000 people coming and going from the nightclub. The guards were randomly patrolling the garage all evening. Although it is unknown how long the men had been sitting in the garage, not one person saw them. The car in which plaintiff rode to the club was parked on the first level of the garage, near the elevators. Plaintiff testified that he did not see the abductors prior to exiting the elevator in the garage. Even when the assailants called to him and told him to get into their vehicle, plaintiff testified that initially, he did not take them seriously. Thus, plaintiff did not contemplate that he was in danger until one of the men got out of the car and pointed the gun at him. Plaintiff admitted that the entire incident took mere seconds.
There is nothing in the record to indicate that a guard's presence would have deterred the assailants. Testimony shows that a large number of people were milling around the garage at the alleged time of the incident. If the steady flow of pedestrian and vehicular traffic did not deter the abductors, we cannot conclude that the presence of a security guard would have done so.
The court of appeal's focus on the missing 1:00 a.m. entry from the security log is unpersuasive. The exact time of the abduction was a hotly contested issue during the trial. Plaintiff produced no evidence to prove that he was abducted at 1:00 a.m. Wendy Whiteman testified that she last *1207 saw plaintiff inside the nightclub at around 11:30 p.m., and she did not see him when she left the club at around 1:00 a.m. According to the emergency room records, plaintiff told hospital employees that he left Club West at midnight. Officer Williams testified from her report and stated that plaintiff told her he had left the nightclub between 12:00 and 12:30. Yet, nine years after the incident, plaintiff testified unequivocably that he remembers leaving the nightclub at precisely 1:00 a.m.
Condon testified that Lombardi was "grasping at straws" when he concluded that the missing entry from the security log could only mean that there was no security guard in the garage at 1:00 a.m. Condon testified that, short of being at the exact site of the abduction, at the precise time of the abduction, there is very little the guards could have done to prevent the incident. Condon also pointed out that the guard patrolling in the truck signed off duty at 1:30 a.m. To sign out, the guard had to drive through the garage to the security hut where the sign-out log was located. Fred Jackson, a NOPPS security guard who was on duty on the night of the abduction, testified that a missing entry in the log did not necessarily mean that the guard did not call in. It is possible that the guard stationed in the hut failed to document the communication.
We cannot conclude that the jury was manifestly erroneous in finding that NOPPS did not breach its duty of reasonable care. Therefore, we reinstate the jury's verdict in favor of NOPPS and against plaintiff.
Because we find that there was no breach of duty, it is unnecessary to discuss causation, damages, and the apportionment of fault.

CONCLUSION
We find that the court of appeal erred in ignoring the manifest error standard of review and substituting its own conclusions for that of the jury; therefore, we reverse the court of appeal's judgment in favor of plaintiff and reinstate the jury's verdict in favor of defendants.
REVERSED; TRIAL COURT JUDGMENT REINSTATED.
CALOGERO, C.J., dissents and assigns reasons.
KIMBALL and KNOLL, JJ., dissent for the reasons assigned by CALOGERO, C.J.
CALOGERO, Chief Justice, dissenting.
Material misrepresentations of fact, illpractice, fraud, and lack of candor in our courts and proceedings should not be trivialized or tolerated in the slightest degree. In this case, plaintiff filed in this Court a Motion to Strike Application for Writ of Certiorari and Review, in which he prayed that this Court strike or otherwise deny the writ application of Gibraltar Savings and Loan, Gibraltar Savings, FGMC Investment Corporation, FGMC, Ltd., Metairie Center Phase I, Ltd., and Reliance Insurance Company, Inc., because of illpractice. Plaintiff alleges that Gibraltar's insurer, Reliance Insurance Company, told the courts below about a $1,000,000 primary insurance policy, implying, if not suggesting, that it was the only available policy, and withheld information regarding the existence of a $10,000,000 excess insurance policy written by the same insurer. Gibraltar and Reliance allegedly did not inform the Fifth Circuit of the excess policy until after the Fifth Circuit reversed the decision of the trial court, rendered an award in favor of plaintiff for $4,363,333, and denied rehearing, and only after the Gibraltar defendants learned that the plaintiff was seeking to buy Gibraltar's rights against Reliance for failure to settle within policy limits. Essentially, plaintiff alleges that the $10,000,000 excess policy was only disclosed after it became evident that the policy would be discovered. According to plaintiff, Reliance introduced into the record at trial only a $1,000,000 policy in order to limit the insurer's liability and to persuade the court to keep the *1208 quantum low or reduce it if the jury granted a higher award. Plaintiff further alleges that, despite repeated requests, Gibraltar and Reliance still refuse to divulge any information regarding when or how they learned that the excess policy had been issued, let alone provide a copy of the insurance policy to plaintiff.
In Crowe v. Smith, 151 F.3d 217 (5th Cir.1998), after a civil lawsuit was settled, the trial court discovered that the defendants and their attorneys had conspired to withhold the existence of a $5,000,000 insurance policy. Consequently, the United States District Court for the Western District of Louisiana fined the insurance company for its full policy limit with interest. Additional reprimands and suspensions were ordered against the defense attorneys. The Court of Appeal affirmed in part, reversed in part, and remanded with instructions, recognizing that the district court possessed the inherent authority to issue criminal sanctions for misrepresentation, but only after due process has been satisfied.
I would hold in abeyance our judgment, and remand this case to the district court for the limited purpose of conducting an evidentiary hearing to determine the roles of the Gibraltar defendants and their attorneys in the alleged concealment of the $10,000,000 excess insurance policy. I would further delay this Court's disposition of defendants' attack on the Court of Appeal judgment, and ruling on the motion to strike the writ application filed in this Court until after the full extent of the alleged misrepresentation, ill-practice, fraud and lack of candor is determined.
Accordingly, I respectfully dissent.
NOTES
[*] Lemmon, J., not on panel. See Rule IV, Part 2, § 3.
[2] Defendants did not appeal the jury's finding that plaintiff was abducted; therefore, the judgment is final on that issue and will not be discussed in this opinion.
[3] The court of appeal dismissed all claims against Club West, Inc., Club Galleria West, Inc., Galleria Investment Corporation doing business as Galleria One and/or The Galleria, Metairie Center Land Development, Ltd., Galleria Land, Ltd., First Gibraltar Mortgage Corporation, Inc., Metairie Center Joint Venture, Metairie Center Land Joint Venture, Galleria Phase One, Ltd., and Metairie Corporation of Texas. The court also dismissed Gibraltar's third party demand against NOPPS.
[4] $4,000,000 in general damages; $290,400 in future medical expenses; $73,933 in future lost wages.
[5] Generally, the Jefferson Parish deputies were assigned inside of the Galleria. They were instructed to provide assistance with parking garage security if needed.
[6] Some of the calls were about vandalism: broken car windows, scratched paint on cars, cut car tires. Others concerned disturbing the peace, public intoxication, auto theft, and fights inside Club West. Some of the calls were requests for an ambulance and to report fires.