STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1325

LESLIE SCHILLING

VERSUS

LYNN W. AURICH, PH.D., ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-99-4357 C/W C-96-3899
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, James T. Genovese, and Shannon J. Gremillion, Judges.

**JNOV REVERSED; CONDITIONAL GRANT OF MOTION FOR NEW TRIAL REVERSED;JURY VERDICT REINSTATED.**

Rick A. Caballero
Attorney at Law
7470 Highland Road
Baton Rouge, LA 70808
(225) 763-6679
COUNSEL FOR PLAINTIFF/APPELLANT:
    Leslie Schilling

James J. Hautot, Jr.
Judice & Adley
P. O. Drawer 51769
Lafayette, LA 70503
(337) 235-2405
COUNSEL FOR DEFENDANTS/APPELLEES:
    Lynn W. Aurich, Ph.D.
    Charter Cypress Behaviorial Health Systems, LLC

**GREMILLION, Judge.**

The plaintiff, Leslie Schilling, appeals the trial court's grant of a judgment notwithstanding the verdict (JNOV) and, conditionally, a motion for new trial in favor of the defendant, Dr. Lynn W. Aurich. For the following reasons, we reverse the grant of JNOV, reverse the conditional grant of motion for new trial, and reinstate the jury's verdict and award.

## FACTUAL AND PROCEDURAL BACKGROUND

Leslie was involuntary committed to psychiatric care by Dr. Aurich on August 15, 1995, the same day as her seventeen-year-old son's (Trey) funeral at which her then-husband, Herbert Schilling, removed his wedding band, placed it on their deceased son's hand, and announced to Leslie that the marriage was over.

Dr. Aurich did not conduct a face-to-face interview with Leslie before committing her to the care of Charter Cypress Hospital. A medical review panel found this failure was a breach of the standard of care.

Leslie filed suit in September 1999.[1] Following a five day trial in August 2010, the jury found that Dr. Aurich breached the standard of care owed to Leslie and awarded her $50,000 for mental anguish and $15,000 for loss of enjoyment of life. Dr. Aurich filed a motion for judgment notwithstanding the verdict (JNOV) and/or a motion for new trial. The trial court granted Dr. Aurich's motion for JNOV, finding that "[t]he evidence . . . was insufficient to support the jury's findings that Dr. Aurich breached the standard of care and had caused damages to the plaintiff." The trial court continued:

---

[1]Leslie initially filed suit against Dr. Aurich and Charter Cypress Behavioral Health System, L.L.C. in August 1996 (docket number 96-3899). In November 1996, Leslie voluntarily dismissed the claim against Dr. Aurich in order that her claims could be brought before the medical review panel. The medical review panel convened and made a finding adverse to Dr. Aurich. The current suit followed (docket number 99-4357). The two suits were initially consolidated by the trial court in November 1999. However, on appeal, docket number 96-3899 (CA 11-1324) was dismissed.

During the trial, Dr. Simoneaux, a member of the medical review panel who found Dr. Aurich had deviated from the standard of care, was offered by the plaintiff as an expert. Dr. Simoneaux's testimony appeared to be advocating to support his medical review panel decision instead of being objective. Because of this, the court placed little emphasis on his testimony. Additionally there was testimony that Dr. Aurich spoke with the plaintiff on the evening of her commitment and went to the hospital to execute the commitment paperwork. Notwithstanding the fact that Dr. Aurich did not wait for the plaintiff to arrive at the hospital to conduct a face-to-face observation, this court feels that given the prior relationship of the plaintiff and Dr. Aurich, that [sic] fact that Dr. Aurich was familiar with the plaintiff's history, and at the insistence of the plaintiff's family and friends, Dr. Aurich's decision to execute the PEC was appropriate. Therefore, it is the opinion of this court that the defendant, Dr. Aurich did not breach the standard of care and is not liable to the plaintiff for damages.

The trial court further conditionally granted a motion for new trial. Leslie now appeals.

## ISSUES

Leslie assigns as error:

1. The trial court erred in granting Dr. Aurich's motion for JNOV as there was ample evidence in the record upon which reasonable jurors, in the exercise of their impartial judgment, could have based their verdict in this case.

2. The trial court erred in granting Dr. Aurich's motion for new trial. The verdict in this case is not contrary to the law and the evidence and does not represent a miscarriage of justice warranting new trial.

## JNOV

In *Love v. Lewis,* 00–06, pp. 4–5 (La.App. 3 Cir. 10/11/00), 771 So.2d 220, 222, *writ denied,* 00–3506 (La. 2/16/01), 786 So.2d 102, we stated:

> La.Code Civ.P. art. 1811 provides the basis for filing a Motion for JNOV. However, Article 1811 does not set forth any specific grounds on which a trial court may set aside a verdict. Therefore, we rely on the well-settled jurisprudence that a JNOV may only be granted when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable people could not arrive at a contrary verdict on the facts at issue. *Peterson v. Gibraltar Sav. & Loan,* 98–1601(La.5/18/99); 733 So.2d 1198. Additionally, "[t]he trial court may not weigh the

2

evidence, pass on the credibility of witnesses, or substitute the reasonable inferences of the facts for those of the jury." *McBride v. H. Brown Machine Shop,* 98–1271, p. 3 (La.App. 3 Cir. 3/31/99); 732 So.2d 650, 652, *writ denied,* 99–1288 (La.7/2/99); 747 So.2d 20, quoting *Webb v. Goodley,* 512 So.2d 527, 530 (La.App. 3 Cir.1987). In reviewing the grant of a JNOV an appellate court must first determine whether the trial court erred in granting the JNOV. The appellate court does this by applying the same criteria as the trial court. *Anderson v. New Orleans Public Service, Inc.,* 583 So.2d 829 (La.1991). If reasonable people could have arrived at the same verdict, given the evidence presented to the jury, then the JNOV is improper. *Id.*

In *Lastrapes v. Progressive Security Insurance Co.,* 10–51, p. 5 (La. 11/30/10), 51 So.3d 659, 662 (quoting *Joseph v. Broussard Rice Mill, Inc.,* 00–628, pp. 4–5 (La. 10/30/00), 772 So.2d 94, 99), the supreme court recently stated (emphasis added):

> The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *This rigorous standard is based upon the principle that when there is a jury, the jury is the trier of fact.*

We find the trial court erred in granting a JNOV in favor of Dr. Aurich. The jury had sufficient evidence before it to allow them to conclude that Dr. Aurich breached the standard of care and that Leslie suffered damages as a result of the involuntary commitment. Louisiana Revised Statute 28:53(B)(1) regulates the involuntary commitment of a person and stated in part, at the time of Leslie's commitment:

> Any physician, psychiatric mental health nurse practitioner, or psychologist may execute an emergency certificate only after an actual examination of a person alleged to be mentally ill or suffering from substance abuse who is determined to be in need of immediate care and treatment in a treatment facility because the examining physician, psychiatric mental health nurse practitioner, or psychologist determines the person to be dangerous to self or others or to be gravely disabled. Failure to conduct an examination

3

prior to the execution of the certificate will be evidence of gross negligence.

The July 1999 medical review panel opinion stated in part:

1. The evidence supports the conclusion that the defendant, DR. LYNN AURICH, failed to comply with the appropriate standard of care as charged in the complaint.

The conduct complained of was not a factor in the resultant damages.

The reasons for the panel's opinion are as follows:

Dr. Lynn Aurich breached the standard of care because he did not meet with Mrs. Schilling face to face and conduct an actual examination before commitment. We feel there is a general lack of impairment arising from the commitment and that the hospitalization was probably appropriate and beneficial to Mrs. Schilling. The major emotional damages were caused by the death of her son and the divorce and the commitment did not significantly add to that burden.

Pursuant to La. R.S. 9:2794(A), medical malpractice actions require that the plaintiff bear the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Many witnesses testified during the week-long trial. Jackie Cefalu, a retired teacher, testified that she met Leslie in the late 1960s or early 1970s, shortly after Leslie had moved to Lafayette. She said they were close friends. Cefalu testified

4

that as soon as she learned of Trey's death she went to stay with Leslie. She attended the funeral and remained with Leslie throughout the day except for one hour when she attended a back-to-school function. She said Leslie was never suicidal and never indicated to anyone that she was going to commit suicide. Cefalu further testified that during the entire time she was there, Leslie did not talk with anyone on the telephone. Cefalu testified that when she returned from her function the police were at the Schilling home. She said Leslie had "no idea what was going on." She asked if "they" had informed Leslie of what was about to happen and said that no one had told her. Cefalu said she asked if she could go and let her know what was about to happen. Cefalu said she was not involved in any way in the decision-making process and that no one asked her opinion. She stated that Leslie "absolutely [did] not" know what was about to happen until Cefalu told her.

Cefalu testified that she rode with Leslie in the police car to Cypress. She described it as a "horrible experience." Cefalu said that she told Herbert that she would have stayed with Leslie every minute of the day if it could have prevented her from having to go to Cypress, but that the decision had been made without her knowledge.

Leslie testified that she was fifty-eight years old at the time of trial and was the Director of the Humanities Resource Center at the University of Louisiana at Lafayette. She said she has worked in the resource department since 1993. Leslie testified that she had been married to Herbert from 1977 to 1996, a little over eighteen years. Leslie said that she and Herbert had three children. At the time of Trey's death, her daughter was sixteen and her youngest son was twelve.

Leslie said that she knew her marriage to Herbert was headed for divorce in July 1995, following a family trip. She said that upon return from the trip, she

contacted Dr. Aurich, on August 1, 1995. She said that she went to see him because there was a lot of "family discord," and she was concerned about her children going through the divorce. She said that during the trip to Florida, her son Trey had been arrested and her youngest son had become "totally inebriated" and that she was worried for her children and wanted to talk to someone to develop a guidance plan for them.

Leslie discussed the Life History Questionnaire that she filled out at her first visit with Dr. Aurich. She noted her age (43) and her main problem as follows "Presently I am depressed. I feel as though I've been stretched so thin that I'm not capable of doing even the most basic tasks." The twelve-page questionnaire requires lengthy written responses in addition to several sections that instruct one to "Underline any of the following that apply to you." In one of those sections, that contains forty options for underlining, Leslie underlined eighteen of them, including one that said "suicidal ideas." With regard to that response, Leslie testified:

> Q. Explain to the jury what you meant when you underlined suicidal ideas.

> A. Sometimes we need a place to start from, and when everything is totally out of control, that's exactly what it would be if you're not there. And that's the point from which you build what you will do to either rectify or solidify or bring together whatever the disparate elements are.

> Q. Had you had thoughts about suicide at some point in your life?

> A. I think everybody has.

> Q. Had you?

> A. I'm certain that were times when yes.

> Q. Okay. Had you ever gotten so far in your mind that you were like, well, I'm going to do it and start thinking about how to do it or had you just had –

6

A. Oh, heavens no.

Leslie testified that Herbert was physically and emotionally abusive.

Leslie's next contact with Dr. Aurich was on August 5, 1995. She said that she called and told him that "when I came home from mass, Herbie had attacked me in the washroom and threatened to kill me and make it look like suicide. I was calling him to tell him that no matter what, if something happened to me, it was not suicide." She denied ever indicating that she was suicidal. Leslie said that Dr. Aurich spoke with both Herbert and Trey that evening.

Leslie next saw Dr. Aurich on August 9, 1995, at which time she turned in the Life History Questionnaire and also partially completed the MMPI-2.[2] Leslie testified that she did not answer all of the 567 questions on the test, leaving some bubbles unmarked. However, all of the questions had been answered on the form submitted into evidence.

On August 12, 1995, Trey was killed when he was accidentally run over by a truck. Leslie testified that Dr. Aurich's office sent flowers to the funeral home on Monday August 14, 1995. Leslie said that she spent time that day writing thank you notes at her dining room table. She said eventually she wrote over 200 thank you notes, which were mailed by Herbert's secretary. However, she said that the thank you note to Dr. Aurich was written on the 14th because she would not have written the note after the commitment.

Leslie described the events on the day of Trey's funeral, including Herbert's announcement at her son's casket that their marriage began with Trey and ended with his death. She said that Herbert further announced she was no longer a part of this family. Leslie said that upon returning home from the funeral, she bathed.

_____

[2] The Minnesota Multiphasic Personality Inventory is a clinical assessment test used by mental health professionals.

7

She denied speaking to Herbert at all and said that she never spoke to Dr. Aurich at all on that day and had not spoken to him since August 9.

Leslie said that Herbert walked in from the kitchen and "told me that the police were here to take me to the hospital because Dr. Aurich wanted to talk to me." She said that the police said nothing to her. Leslie said that upon her arrival at Cypress, she felt tricked because she thought Dr. Aurich wanted to speak with her, and he was not there. She said, "I realized that Herbie had done this to get me out of the house." Leslie went on to describe the ensuing strip search and meeting with doctors the next day.

Leslie said that while in the institution, she first saw Dr. Aurich on August 16, 1995, at which time he suggested that she take medication. Leslie testified that she declined to take the medication based on the "zombie-like" appearance of the other patients in the facility. She said that Dr. Aurich told her that if she was not cooperative, he would cease being her doctor. Leslie said that she was at Cypress until August 24, 1995. Other than taking an antibiotic for an upper respiratory infection, Leslie said that she did not take any other medication while there. Leslie said that on the day of her departure from the hospital, she called friends who picked her up. She attempted to return to her home, but two deputies served her with divorce papers and would not allow her to go into the house. She said that she never spent another night in the home.

Leslie described how the commitment affected her: she was unable to see her children during the critical time following their brother's death; she was unable to care for her father, who was dying of cancer and relied upon her for basic tasks; and how the commitment affected all custody issues and her children's view of her, stating that Herbert used "the forced commitment as evidence that their mother was crazy." Leslie continued that the forced commitment was a problem at school

8

(her employment). She said that she worked with a therapist for several months to deal with the emotional impact of the forced commitment.

Dr. John Simoneaux, an expert psychologist, testified that he was a member of the medical review panel that decided whether Dr. Aurich breached the standard of care. Dr. Simoneaux testified that he has been involved with hundreds of PECs (Psychologist Emergency Certificates) over the years involving his employment at various institutions. In sum, Dr. Simoneaux testified that it was the panel's opinion that the statute's requirement of an "actual" exam required an in-person examination before a person can be involuntary committed. He said that the normal practice in the area has determined "actual" to mean an in-person examination. Dr. Simoneaux testified that the panel was further of the opinion that it violated the standard of care to conduct a phone interview rather than an in-person examination. Essentially, the standard of care required an in-person examination before a person can be involuntarily committed. Thus, Dr. Aurich breached the standard of care by not conducting an in-person examination of Leslie. However, Dr. Simoneaux opined that "the damage resulting from the hospitalization [was] not there because a hospitalization probably would have occurred had he done an actual examination anyway." Dr. Simoneaux further testified that the commitment damages were not significant in comparison to the damages Leslie was already suffering due to other life events. However, Dr. Simoneaux noted that "it is unrealistic to think that someone who ha[s] been committed does not suffer damages from a commitment."

Dr. Philip Landry, a psychiatrist, testified that he believed a face-to-face examination within twenty-four hours was required before a patient could be involuntary committed. He testified that he agreed with the medical review panel's opinion that Dr. Aurich breached the standard of care. Dr. Landry testified that he

9

first met Leslie the day after her commitment to Cypress. He said that Leslie appeared neither suicidal nor psychotic during his initial interview of her. He testified that Leslie's clinical presentation did not coincide with the descriptions that were provided by Dr. Aurich.

Dr. Landry testified that at the time he saw Leslie, within twelve hours of her admittance to the hospital, he did not believe she was suicidal nor did he find any evidence of psychosis or a character disorder such as borderline personality. Although Dr. Aurich recommended that Leslie be medicated, Dr. Landry did not feel it was necessary to prescribe any medication for Leslie. He stated he would not have committed her based on his impression of her when he assessed her the following day. However, on cross-examination, he admitted that his final diagnosis included, among other diagnoses, "borderline personality disorder," based on the history and testing he had received. He further testified that he agreed to be the admitting physician at the hospital and that Dr. Aurich had telephoned him prior to the commitment to confirm same, as Dr. Aurich was unable to admit patients at Cypress without a consulting order from a doctor with privileges at the hospital.

Dr. Landry was asked why he did not release Leslie sooner to which he responded that he wanted to be sure she was not suicidal. Dr. Landry found Leslie's case "puzzling," so much so that he did some investigation of collateral sources. He stated that essentially, Herbert and his friends advised that she was suicidal while Leslie's friends stated that she was not. Dr. Landry did feel that the hospitalization was beneficial to Leslie from an emotional standpoint due to all of the tragedies that had occurred in her life; however, he was not sure if the commitment would adversely affect her in other ways, such as harm to her reputation or, from a legal standpoint, disadvantage her in child custody litigation.

10

Dr. Ted Friedberg, a clinical psychologist, was a member of the medical review panel in this case. He testified he was of the opinion that Dr. Aurich breached the standard of care because he failed to conduct a face-to-face examination of Leslie. Dr. Friedberg further testified that he has never committed anyone over the telephone; an in-person examination is required. However, he said that the panel did not feel that Leslie's damages were significant because of all of the other trauma she was experiencing due to the loss of her son and marriage. Dr. Friedberg testified that the panel decided that less than five percent of the damages she was suffering at the time were attributable to the involuntary commitment. Dr. Friedberg stated, "[S]he's got bigger problems than this, you know, even though when you PEC somebody, you put somebody in the hospital against their will, that's not a fun thing. Nobody is looking forward to that experience. And it's a traumatic experience. But compared to everything else, it wasn't much."

Dr. Aurich testified that Leslie is the only patient he has ever had to administer a PEC for admission. He reviewed his notes from their first visit on August 1, 1995, noting that Leslie presented with a "stress reaction and significant marital discord." Dr. Aurich testified that he also noted "suicidal ideation." Dr. Aurich said that at the initial meeting he conducted a suicide risk assessment, noting that some people may have suicidal thoughts, but really have no plans to actually do it. He discussed his method of evaluating a person's suicide risk based on method, availability, specificity, and lethality. Dr. Aurich testified that Leslie had suicidal thoughts but "didn't have a plan or anything like that." He said that he felt her risk of suicide was low. He testified that he did have Leslie sign a no-suicide contract in which she agreed to not commit suicide or to call him if she was having suicidal thoughts.

11

Dr. Aurich testified that his next contact with Leslie was on the evening of August 5. He stated that Leslie called and said that she felt suicidal following an altercation with her husband and that in honoring the no-suicide contract she was calling as instructed. Dr. Aurich testified that Leslie had intent and a plan this time, indicating that she was going to crash her car or take drugs to complete her mission. Dr. Aurich said he spoke with Herbert, but that he discounted Leslie's claims. Dr. Aurich said that he recommended Leslie go to the hospital that night but she adamantly refused. Dr. Aurich indicated that she should have someone stay with her, and her son, Trey, agreed to do so. Dr. Aurich had no further contact with Leslie that evening.

Dr. Aurich next saw Leslie on August 9, 1995, at which time she returned to his office with her Life History Questionnaire. Dr. Aurich noted at the appointment that Leslie:

> called me Saturday night threatening suicide, very resistant to my recommendations, talked with husband who was not cooperative with me, recommended that she be hospitalized, but he disagreed. . . . he still wants her out of the house. She reported to me that he has threatened to kill her numerous times. We discussed that at some length. And then my comment was she is in denial, resistant, rigid.

Dr. Aurich had noted that Leslie indicated at the August 5th appointment that Herbert threatened to kill her and make it look like a suicide. Dr. Aurich said that "apparently, he had made these threats numerous times." Dr. Aurich testified that the MMPI-2 was administered to Leslie at this appointment, and the results were received on August 14, 1995. Dr. Aurich then testified at length regarding the MMPI-2 results. In sum, he said the results indicated that the most likely diagnosis for Leslie, based on her answers, was paranoid schizophrenic.

He then testified regarding the events of August 15, 1995. Dr. Aurich said he spoke with Herbert sometime between 8:00 and 9:00 p.m., who informed him

12

that Leslie was threatening suicide, indicating that she was going to be with Trey. Dr. Aurich said that he spoke with Leslie after he spoke to Herbert. Dr. Aurich testified that Leslie indicated that she wanted to go home with her son Trey and was "done with everything." Dr. Aurich said that he conducted a suicide assessment over the phone using the four aforementioned factors. Dr. Aurich related that Leslie said she was going to crash her car or take pills. He considered Leslie to be a serious suicide risk that evening based on his assessment and the surrounding facts and circumstances. He advised Leslie that he wanted her to go to the hospital, but that she adamantly refused. He said that he spoke with Herbert again and recommended a PEC because Leslie refused to go to the hospital. Dr. Aurich testified:

> [Herbert] agreed with me and agreed that he would see to it that she got to Charter Cypress Hospital. I told him that I would immediately go to the hospital and fill out the necessary paperwork and would then call him back – or rather I would see – I'm sorry. That I would then see her on the following day and follow her while she was in the hospital.

Dr. Aurich then testified that he received a call from Nancy Mounce, a family friend, who was extremely worried for Leslie's safety. He said that he went to the hospital to fill out the PEC. He recorded various assessments including "suicidal ideation and specific plan." Dr. Aurich testified there was nothing he could have learned from a visual examination that would have changed his mind about the necessity for hospitalization.

Regarding the need for an in-person, face-to-face examination, Dr. Aurich opined that the ethical principles set forth by the Louisiana Board of Examiners which incorporates the APA Ethical Principles of Psychologists do not require a face-to-face or a visual assessment. Dr. Aurich testified that he met with Leslie the day after she was involuntary committed. He said that he recommended that she

13

take an anti-depressant medication. He continued to work with Leslie while she was hospitalized, but he felt as though they were not making any progress. Dr. Aurich noted that if Leslie continued to refuse medication, he would have "no choice" but to remove himself from her care. By August 21, 1995, Dr. Aurich had withdrawn from the case, leaving Leslie in the hands of Drs. Landry and Ally.

Dr. Mark Warner, a clinical and neurological psychologist, testified that he trained law enforcement officers for twelve years, served for fourteen years on the medical ethics board, and the same amount of time training medical residents in dealing with patients with emotional problems. Dr. Warner testified that all four physicians who encountered Leslie following the commitment maintained the commitment. He said that every doctor maintained Dr. Aurich's initial PEC until the coroner came in and rendered a Coroner's Emergency Certificate, the next step in the process. Dr. Warner opined that the medical review panel failed to consider all of the sources and to document the basis for their opinion. He said in determining whether the standard of care has been breached the panel should have considered state law, licensing board regulations, ethical principles of the professional associations, case law, and finally, consensus of the community. He was of the opinion that the word "actual" did not require a face-to-face examination, but that the extent of the data one had, and the evaluation conducted to determine risk factors from an objective standpoint, were more important. Dr. Warner felt Dr. Aurich's actions were reasonable and clinically sound based on his previous sessions with Leslie, the completed psychological testing, the phone calls, the events of the day. Dr. Warner opined that Dr. Aurich met or exceeded the standard of care for psychologists in issuing the PEC.

Marilyn Crane testified that she has known Leslie since about 1980 and that their children attended school together. She also said that she has known Herbert

since 1970 or so; they attended college together and Herbert's first wife was her sorority sister. Crane's husband has known Herbert since high school. Crane said that she and Leslie developed a close friendship by about 1990. Crane testified that she does not know Dr. Aurich. Crane said that she assisted with some of the details of Trey's funeral and that she had extensive conversations with Leslie the day of the funeral. She said that Leslie indicated that her "life was over," "that she had nothing to live for," and that "she wanted to be with her son." Crane said that Leslie was generally "theatrical," but her demeanor that day was "was very subdued and reserved and serious. And it worried me a lot." Crane said she informed Herbert that she was concerned about Leslie. She said that Herbert then asked her to write down what Leslie had told her "so that they would have a clear idea of what had transpired." Crane then read her handwritten note.

## DISCUSSION

Dr. Aurich's argument in favor of his JNOV was that there was no evidence presented to the jury that would allow them to conclude that Leslie would not have been hospitalized had Dr. Aurich conducted an actual, face-to-face examination of her. We agree that all of the doctors found that based on the facts and circumstances known at the time, and after a face-to-face examination, an involuntary commitment would have been proper. Yet, that is not the standard. The jury heard testimony from several witnesses that an actual exam, according to local standards, requires a face-to-face meeting within seventy-two hours prior to the involuntary commitment. We find nothing unreasonable about this requirement and do not think that this standard should be excused based on the particular circumstances. The severity of committing someone against their will to a psychiatric institution should, at a minimum, require that the strictest of formalities

15

be met. Clearly, the jury agreed, and it is not our function to second-guess their credibility assessments and reasonable conclusions.

There was some debate as to whether Dr. Aurich spoke with Leslie on the phone the evening of the commitment (he claimed he did, Leslie claims he did not). Even assuming that he did, there was still no error in the jury's finding that he breached the standard of care by not conducting a face-to-face examination of Leslie.

The trial court noted at the hearing on the JNOV, "What troubles me more than anything else is the fact that Dr. Simoneaux was on that medical review panel and then he was submitted as an expert in the plaintiff's case." We find this reason for granting Dr. Aurich's JNOV unimpressive. Members from the medical review panel regularly testify at trial.

Dr. Aurich argues that the initial commitment without a face-to-face examination was valid because the subsequent doctors maintained her commitment for nine days before releasing her. However, reasonable people could conclude from examining the evidence that, out of abundance of caution, and due to the assertions made by Dr. Aurich, further investigation into Leslie's emotional state was required before it would be prudent to release her. It is not surprising that all of the subsequent doctors who "maintained" the commitment noted the suicidal ideation on their various forms given the circumstances and the information presented to them by Dr. Aurich. The jury had evidence before it, including Dr. Landry's testimony, that he would not have committed Leslie. The fact remains that reasonable people, including the medical review panel, could find that Dr. Aurich's failure to conduct a face-to-face interview of Leslie within seventy-two hours before committing her was a breach of the standard of care requiring an "actual" examination of the patient.

16

Having noted all of that, we address whether Leslie suffered any damages. It is preposterous to assume, as Dr. Aurich suggests, that being involuntarily committed into a mental institution on the day of your son's funeral is a tort without damage. One does not need expert testimony to imagine what a traumatic effect being carted off by the police, being stripped naked, and undergoing a cavity search would have on a woman, not to mention the legal ramifications of having an involuntary commitment used against you in divorce and custody litigation. Clearly, burying a child is one of the worst things a person could endure, but that does not lessen the effect of being involuntarily committed the same day. On the contrary, it aggravates it. Any reasonable juror could have found that Leslie suffered damages due to the involuntary commitment.

The case before us presents classic credibility determinations and assessments of the evidence by the jury. A reasonable person, considering the evidence before the jury, could readily find that Dr. Aurich breached the standard of care and that Leslie suffered damages as a result. Accordingly, the trial court erred in granting a JNOV in favor of Dr. Aurich.

## MOTION FOR NEW TRIAL

In this assignment of error, Leslie argues that the trial court erred in conditionally granting a motion for new trial in the event we find that JNOV was not warranted. Louisiana Code of Civil Procedure Article 1972(1) provides that a new trial shall be granted "[w]hen the verdict or judgment appears clearly contrary to the law and the evidence." We review the trial court's grant of a motion for new trial using the abuse of discretion standard. *Martin v. Heritage Manor S. Nursing Home,* 00-1023 (La. 4/3/01), 784 So.2d 627. The trial court has wide discretion in granting a new trial. Nevertheless,

17

The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. *A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light.* Thus, the jury's verdict should not be set aside if it is *supportable by any fair interpretation of the evidence. Gibson v. Bossier City General Hospital, et al., supra.* See also *Engolia v. Allain,* 625 So.2d 723 (La.App. 1 Cir.1993). (Emphasis added.)

*Davis v. Wal-Mart Stores, Inc.,* 00-0445 (La.11/28/00), 774 So.2d 84, 93.

As part of its consideration of whether to grant a new trial, "the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and evaluate witness credibility to determine whether the jury had erred in giving too much credence to an unreliable witness." *Joseph v. Broussard Rice Mill, Inc.,* 00-628, pp. 14-15 (La.10/30/00), 772 So.2d 94, 104. As an appellate court "[W]e are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial." *Davis,* 774 So.2d at 93-94. "The scales are clearly tilted in favor of the survival of the jury's verdict, but the trial court is left with a breadth of discretion which varies with the facts and events of each case." *Id.* at 94.

Based on our review of the evidence, the jury's finding that Dr. Aurich breached the standard of care was not clearly contrary to the law and evidence. Thus, the trial court abused its discretion in conditionally granting the motion for a new trial. We, therefore, reverse the trial court's grant of a conditional new trial and reinstate the jury's verdict awarding Leslie $65,000 in damages.

18

## CONCLUSION

We reverse the trial court's grant of a judgment notwithstanding the verdict; reverse the trial court's conditional grant of a motion for new trial; and render judgment reinstating the jury verdict awarding the plaintiff-appellant, Leslie Schilling, $65,000 in damages. All costs of this appeal are assessed against the defendant-appellee, Dr. Lynn W. Aurich.

**JNOV REVERSED; CONDITIONAL GRANT OF MOTION FOR NEW TRIAL REVERSED; JURY VERDICT REINSTATED.**