h KNOLL, Judge.
This appeal arises from a medical malpractice claim by Jacqueline Leyva against Iberia General Hospital and Drs. G.D. Sagrera, Emil Laga, and J.B. Pecot. Ms. Leyva settled with the hospital prior to trial, and at the close of the plaintiffs evidence, Drs. Laga and Pecot were dismissed on a motion for a directed verdict. As to the remaining defendant, Dr. Sagrera, Ms. Leyva alleged that his negligent performance of a bilateral tubal ligation in 1986 caused her to undergo three subsequent surgeries. A jury disagreed and returned a verdict in favor of Dr. Sagrera. We affirmed. Leyva v. Iberia Gen. Hosp., 93-768 (La.App. 3 Cir. 3/2/94), 634 So.2d 1297.
RThe Louisiana Supreme Court granted writs and reversed the decision of this court, finding that the testimony of the plaintiffs expert obstetrician/gynecologist, Dr. Jack Pruitt, was improperly excluded below. Leyva v. Iberia Gen. Hosp., 94-795 (La. 10/17/94), 643 So.2d 1236. The case was remanded for our de novo review of the record, including the proffered testimony of Dr. Pruitt, and rendition of a judgment on the merits.
FACTS
The facts of this case are well stated in the opinion of the Louisiana Supreme Court and in the previously published decision of this court, both cited above. Accordingly, we will not reiterate the facts herein, except where appropriate in our treatment of the issues presented.
*488 NEGLIGENCE
Ms. Leyva claims that Dr. Sagrera negligently faded to ligate her left fallopian tube during a bilateral tubal ligation performed immediately after the birth of her second child on February 23, 1986. To determine whether the left tube was ligated, Ms. Leyva underwent an exploratory laparotomy on April 4, 1986. Ms. Leyva claims that Dr. Sagrera also breached the appropriate standard of care during the second surgery in fading to obtain a tissue specimen for pathological analysis and verification that the left tube was properly ligated. She contends that as a result of these negligent acts, she should be compensated for the pain and suffering caused by the April 4 surgery, the anxiety of not knowing whether she is now, in fact, sterile, and for the pain and suffering caused by two additional surgeries, an appendectomy in mid-1986 and the removal of an ovarian cyst in May 1987, which she argues were necessitated by Dr. Sagrera’s negligence.
LLa.R.S. 9:2794 requires that the plaintiff in a medical malpractice case prove by a preponderance of the evidence: (1) the degree of skdl and care ordinarily possessed and exercised by physicians within the defendant’s specialty; (2) that the defendant either lacked that skill or failed to use that care; and (3) that as a proximate result of this lack of skill or care the plaintiff suffered injuries that he would not have otherwise incurred. The opinions of expert witnesses who are members of the medical profession qualified to testify on the subject are necessary to determine whether the defendant physician possessed the requisite degree of knowledge or skill, or failed to exercise reasonable care and diligence. Young v. Colligan, 560 So.2d 843 (La.App. 3 Cir.), writ denied, 565 So.2d 452 (La.1990).
First 'procedure. In support of her claim that Dr. Sagrera failed to ligate the left fallopian tube during the first surgery, Ms. Leyva presented the testimony of Drs. Laga and Peeot. Dr. Laga examined the tissue specimen designated “left fallopian tube” both grossly and microscopically, but could find no structure in the specimen which had the characteristics of a fallopian tube. He then asked Dr. Peeot, the chief pathologist at Iberia General Hospital, and Drs. William Newman and Ronald Welsh, Professors of the Department of Pathology at LSU Medical Center in New Orleans, to examine the specimen microscopically. Each of them concurred in Dr. Laga’s findings that the specimen contained only fibroconnective and vascular tissue; no fallopian tube was present.
Dr. Sagrera testified that he was surprised to learn from the pathology report that he had apparently ligated a vein instead of the left fallopian tube. He stated that during surgery, he had experienced some difficulty visualizing Ms. Leyva’s entire left fallopian tube due to the size and position of her uterus, but nonetheless felt confident that he had, in fact, properly ligated the left fallopian tube. Since the pathology report | indicated otherwise, Dr. Sagrera opined that a mix-up in tissue samples had occurred in the operating room or in the pathology laboratory, thereby accounting for the unexpected lab results. However, he could produce no evidence to support his theory, and ultimately admitted that he had no explanation why the tissue sample sent to pathology was found to be a vein and not fallopian tube. Dr. Sagr-era then conceded that if during the first surgery he had removed a section of vein instead of the fallopian tube, he would be guilty of malpractice.
All of the medical evidence presented at trial points toward the conclusion that during the first procedure, Dr. Sagrera did indeed ligate a section of vein instead of the left fallopian tube. Dr. Sagrera admitted that because Ms. Leyva’s uterus was enlarged following childbirth and tended to rotate to the left, it was impossible for him to visualize her entire left fallopian tube. Each of the physicians who testified stated that it is crucial to visualize and isolate the fallopian tube before an incision is made because the tube is anatomically similar to other structures which surround it. Four distinguished pathologists examined the tissue specimen that Dr. Sagrera removed during surgery, and each concluded that only fibroconnective and vascular tissue, not fallopian tube, was present. Based on the record before us, we find *489 that Ms. Leyva met her burden of proving that Dr. Sagrera breached the standard of care to which he is held by negligently failing to ligate her left fallopian tube during the first procedure.
Second procedure. After Dr. Sagrera received the pathology report stating that the tissue specimen marked “left fallopian tube” contained only fibroconnective and vascular tissue, he recommended to the plaintiffs mother, Nellian Dore, that Ms. Leyva undergo an exploratory procedure to confirm whether the left tube was ligated, |5and if not, to do so. Ms. Leyva agreed to the procedure, and a mini-laparotomy was performed by Dr. Sagrera on April 4, 1986.
Dr. Sagrera testified that during the lapa-rotomy, he opened Ms. Leyva’s abdomen, identified and isolated the left fallopian tube, and visually noted that it appeared to be properly ligated. He then closed the incision. When asked what he did to confirm that the ligated structure was in fact fallopian tube and not a vein or similar structure in the vicinity of the fallopian tube, Dr. Sagrera replied:
“I looked at it, the surgical scrub nurse looked at it, and the people in the operating room looked at it; and we all agreed that it was fallopian tube, that it had been cut.”
Dr. Sagrera maintained that any further verification, including the removal of a tissue specimen for pathological analysis, was unnecessary:
“Q: I understand what you’re saying. Did you, sir, snip a sample of the tissue from what you thought was the fallopian tube at the time of the second procedure and have that put in a bottle so that could be sent down to Pathology so that they could verify for you that indeed it was fallopian tube since there obviously was some inconsistency that you couldn’t explain?
A: No, that was unnecessary, too.
Q: I see. So in other words what you’re telling the members of the jury is that you made the decision by looking and seeing what you saw the first time; it wasn’t necessary to have your findings verified or your impressions verified by the Pathology Lab this time. Is that correct?
A: Yes, because doing that may add an extra dimension and more pain and suffering to the lady. This way there was almost no pain and suffering for this lady. Just looking in didn’t require — I mean it was not like, you know, removing more tissue. There was no need to remove more tissue; enough had been removed.
Q: Doctor, you’re telling us that if you had gone in with your little scissors and snipped a piece of what you say was fallopian tube, that this would have caused the patient significant pain and suffering and that’s why you didn’t do it?
A: That’s part of the reason, but the basic reason was it wasn’t necessary.
Q: Well, wasn’t it always considered to be the standard of care, Doctor, when you performed a procedure on a patient such as this and you took what you ^thought was fallopian tube, even when you were absolutely positive that what you were looking at was fallopian tube, that you’d send a specimen down to the lab to have it verified?
A: No, it’s not the standard of care.
Q: Doctor, correct me if I’m wrong, but didn’t you testify earlier today that in doing the [bilateral tubal ligation] it was your standard of care to verify that you had cut fallopian tube by sending a sample down to the Pathology Lab. Isn’t that what you said earlier?
A: Originally, but this is not the original procedure. This is a secondary procedure that you’re talking about.
Q: Yes, sir, you’re correct. And wouldn’t it be even more important in a procedure where you’ve been told by the Pathology Lab that what you were so sure was fallopian tube could not be identified as fallopian tube by them? Wouldn’t it be even more important in a procedure such as that?
A: No, it would not.”
Ms. Leyva argues in brief that because the pathology report called into question whether the first procedure had been properly performed, Dr. Sagrera should have removed a *490 tissue specimen during the laparotomy for pathological analysis and objective confirmation that the left tube was ligated.
Dr. Jacob Lahasky, a family practice physician in New Iberia, served on the medical review panel which exonerated Dr. Sagrera. Dr. Lahasky testified at trial that Dr. Sagr-era’s visual observation of the left fallopian tube during the laparotomy was sufficient to verify the success of the tubal ligation, and that Dr. Sagrera was under no obligation to do so by any other means. Dr. Lahasky concluded that Dr. Sagrera did not breach the standard of care during the second procedure by failing to submit a tissue specimen to the pathology laboratory for analysis.
The testimony of Drs. Sagrera and Laha-sky was contradicted by that of Dr. Pruitt, the plaintiffs expert. Dr. Pruitt testified that Dr. Sagrera’s visual inspection of the left fallopian tube was an insufficient basis upon which to assure Ms. Leyva that she was sterile. He further stated that since Dr. Sagrera’s purpose in performing the ^exploratory laparotomy was to rule out a previous inadequate tubal ligation, the standard of care dictated that Dr. Sagrera remove a segment of the ligated structure and send it to pathology for verification.
Dr. Pruitt characterized as “meaningless” the observation of the left fallopian tube made by the operating room staff. He explained that since the physician himself cannot always identify the tube with certainty, “people looking over your shoulder and peeking in, they’re not going to be able to tell.” Dr. Pruitt emphasized repeatedly during his testimony that the most reliable way to verify that the tubes are properly ligated is to send a tissue specimen to pathology. According to Dr. Pruitt, therefore, Dr. Sagr-era’s failure to do so in Ms. Leyva’s ease was a breach of the standard of care.
Regarding Dr. Sagrera’s testimony that taking a tissue specimen during the laparoto-my was unnecessary despite objective pathological findings that the left fallopian tube had not been ligated during the first surgery, Dr. Pruitt stated:
“A: That’s one of my real problems with the case. The only reason the abdomen was re-entered was because of that pathology report. And, therefore, to re-enter a pelvis and then not to make that report correct is beyond — I don’t understand why anybody would do that.
Q: I want you to assume that Dr. Sagrera has testified that the reason he didn’t take another sample of fallopian tube when he went back in on April 4th to do his re-operation was because he wanted to save the patient from the additional pain and suffering that would ensue as a result of his removing a piece of fallopian tube. In your experience is that medically justifiable?
A: The additional pain and the suffering is from the stress of the procedure itself, and the abdominal incision is what most people complain of pain. Taking a little additional piece of tube which would have taken in operating time maybe 60 seconds in my opinion certainly would not have added any additional pain and suffering to any significant degree at all.”
After carefully considering the entire record, including the testimony of Drs. Sagrera, La-hasky, and Pruitt, we find that Dr. Sagrera committed malpractice during the second procedure. We agree with Dr. Pruitt’s assertion that in light of the pathology report, it was incumbent upon Dr. Sagrera to objectively and independently verify the | gsuccess of the first surgery by removing a tissue specimen during the laparotomy and submitting it to the pathology laboratory for analysis. Under the facts of this case, Dr. Sagr-era’s failure to do so constitutes negligence, and he is hable to Ms. Leyva for the damages she sustained.
Third and fourth procedures. Ms. Leyva also claims that Dr. Sagrera’s negligence necessitated an appendectomy three months after the laparotomy (third procedure) and surgery in 1987 to remove an ovarian cyst (fourth procedure). However, even the plaintiffs own expert, Dr. Pruitt, was unwilling to relate the need for these procedures to the bilateral tubal ligation performed by Dr. Sagrera. A plaintiff in a medical malpractice action must establish, with adequate evidence, a causal connection between his injuries and the negligence of *491 the defendant. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La. 10/17/94), 643 So.2d 1228. Finding no such evidence in the record before us, we conclude that Ms. Leyva has failed to meet her burden of proving a causal connection between the third and fourth procedures and Dr. Sagrera’s negligence.
QUANTUM
A court of appeal may award damages in cases where the trier of fact initially rejected the plaintiffs demands and the record contains sufficient proof of damages. Fontenot v. Bolfa, 549 So.2d 924 (La.App. 3 Cir.1989). In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by the record. Savelle v. Heilbrunn, 552 So.2d 52 (La.App. 3 Cir.1989), writ denied, 556 So.2d 1267 (La.1990).
General damages are those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, | ginconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life style which cannot be measured definitively in terms of money. Anderson v. Welding Testing Lab., Inc., 304 So.2d 351 (La.1974).
The record in the case sub judice shows that Ms. Leyva was hospitalized for one day after the laparotomy. She testified that the pain was “awful” for approximately two weeks and that she could not take care of her children during this time; her mother had to do everything for her. The scar on her lower abdomen, some three inches in length, is still very sensitive and is a painful reminder of the failed surgery. Ms. Leyva has been subjected to two surgical procedures to assure that she can bear no more children, yet even today, she remains uncertain whether she is sterile. Under the facts of this case, we find that $50,000 is an appropriate award of general damages, to include mental and physical pain and suffering.
DECREE
For the reasons assigned, the judgment of the trial court is reversed.
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, JACQUELINE DORE LEYVA, and against the defendant, DR. G.D. SAGRERA, M.D., in the sum of FIFTY THOUSAND ($50,-000.00) DOLLARS, together with legal interest from date of judicial demand until paid.
Costs of trial and of this appeal are assessed to Dr. G.D. Sagrera, M.D.
REVERSED AND RENDERED.
DOUCET, C.J., dissents and assigns written reasons.