# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 14-61
## consolidated with 14-62


TALESHA BERTRAND, ET UX.

VERSUS

MICHAEL KUDLA, M.D., ET AL.


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-4047
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

**********

## PHYLLIS M. KEATY
## JUDGE

**********

Court composed of Sylvia R. Cooks, J. David Painter, and Phyllis M. Keaty, Judges.


**REVERSED IN PART AND RENDERED.**


Benjamin P. Mouton
McGlynn, Glisson & Mouton
Post Office Box 1909
Baton Rouge, Louisiana 70821
(225) 344-3555
Counsel for Plaintiffs/Appellants:
    James Bertrand
    Talesha Bertrand

**William C. Rowe, Jr.,**
**David C. Bolton**
**Rowe Law Firm**
**5157 Bluebonnet Boulevard**
**Baton Rouge, Louisiana  70809**
**(225) 293-8787**
**Counsel for Intervenors/Appellees:**
    **Louisiana Patient's Compensation Fund**
    **Louisiana Patient's Compensation Fund Oversight**
    **Board, through the nominal defendant, Dr. Michael Kudla**

**James R. Shelton**
**Durio, McGoffin, Stagg & Ackermann**
**Post Office Box 51308**
**Lafayette, Louisiana  70505-1308**
**(337) 233-0300**
**Counsel for Defendants/Appellees:**
    **Louisiana Medical Mutual Insurance Company**
    **Michael Kudla, M.D.**

**J. Gregory Bergstedt**
**Elizabeth F. Shea**
**Fraser, Wheeler & Begstedt**
**4350 Nelson Road**
**Lake Charles, Louisiana  70605**
**(337) 478-8595**
**Counsel for Defendants/Appellees:**
    **Preferred Professional Insurance Company**
    **Robert Rumsey, M.D.**

**KEATY, Judge.**

Plaintiffs, Talesha and James Bertrand, appeal from a judgment notwithstanding the verdict (JNOV) denying Plaintiffs' request for an additional award of special damages to Talesha for her loss of income and for an increase of the general damage award. For the following reasons, we reverse in part and render.

### FACTS AND PROCEDURAL HISTORY

Talesha delivered her third baby on December 13, 2004. She subsequently underwent a tubal ligation. Dr. Michael Kudla delivered her third baby and performed the tubal ligation. Dr. Robert Rumsey, a pathologist, examined the tube segments after Talesha's surgery. In his pathologist report which was prepared on December 16, 2004, Dr. Rumsey indicated that the tubal ligation was incomplete. A copy of this report was placed in Talesha's hospital chart and in her chart at Dr. Kudla's office.

Talesha subsequently presented to Dr. Kudla on December 27, 2004, for a post-partum checkup. Dr. Kudla failed to advise Talesha that the tubal ligation was incomplete. Talesha was cleared medically to resume her daily activities, including sexual relations. Talesha thereafter became pregnant with her fourth child, which was unplanned. During her office visit with Dr. Kudla in May of 2005, he referred to Dr. Rumsey's pathology report advising that Talesha's tubal ligation was incomplete. Talesha's fourth baby was subsequently delivered by Dr. Stephen Schorr on March 7, 2006. Dr. Schorr thereafter performed a complete tubal ligation on Talesha.

A request for a medical review panel against Dr. Kudla and Dr. Rumsey was filed by the Bertrands. Dr. Kudla settled the claims against him before the case

was reviewed by the medical review panel. Dr. Kudla's professional liability insurer, the Louisiana Medical Mutual Insurance Company (LAMMICO), paid the Bertrands $100,000.00 in settlement. The Bertrands then filed a Petition for Damages against Dr. Kudla and LAMMICO (collectively Dr. Kudla) arising out of Dr. Kudla's medical malpractice. After Dr. Kudla answered, the Bertrands filed a Petition Seeking Approval of Settlement and Demanding Payment of Additional Damages from the Louisiana Patient's Compensation Fund (PCF). Dr. Kudla filed his answer to this petition acknowledging the settlement for $100,000.00. A Judgment of Approval of the settlement between the Bertrands and Dr. Kudla was signed by the trial court on August 23, 2007. In February 2008, the PCF[1] intervened.

The medical review panel subsequently reviewed the claims against Dr. Rumsey. After the panel issued an opinion, the Bertrands filed suit in December of 2008 against Dr. Rumsey and his professional liability insurer, Preferred Professional Insurance Company (PPIC) (collectively Dr. Rumsey). The two cases were consolidated in the trial court.

In June of 2012, the consolidated cases went to trial by jury. At trial, the Bertrands attempted to prove that Dr. Rumsey breached the standard of care. The Bertrands argued that Dr. Rumsey's alleged negligence, combined with Dr. Kudla's admitted negligence, caused the undesired fourth pregnancy. The Bertrands sought general and special damages. The jury rendered a verdict in favor of Dr. Rumsey and against the Bertrands, dismissing their demands with

---

[1] The Motion and Order for Intervention contained in the record lists only the PCF as an intervenor. Other documents in the record, however, indicate that both the PCF and the PCF Oversight Board are intervenors through the nominal Defendant, Dr. Kudla. Therefore, we will refer to the PCF as including both the PCF and the PCF Oversight Board.

prejudice against Dr. Rumsey only. The jury, however, found in favor of the Bertrands and against Dr. Kudla, and awarded $50,000.00 in general damages plus medical expenses from May 31, 2005, through March 15, 2006, in the amount of $6,252.15 for a total $56,252.15. The jury assigned 5% fault to Talesha and 95% fault to Dr. Kudla. James was awarded nothing on his loss of consortium claim. The trial court signed a judgment on November 26, 2012, in conformance with the jury verdict. The money judgment against Dr. Kudla was reduced by the 5% fault assigned to Talesha for a total of $53,439.54 plus legal interest.

The Bertrands subsequently filed a motion for JNOV. Their JNOV dealt with four aspects of the jury's verdict in favor of Talesha and against Dr. Kudla. The JNOV was granted in part and denied in part by the trial court. Specifically, the trial court found that the jury's finding of 5% fault to Talesha was contrary to the law and evidence and granted the JNOV as to this issue, finding Dr. Kudla 100% at fault. The trial court also granted the JNOV as to the jury's award for past medical expenses, increasing the award from $6,252.15 to the stipulated amount of $19,588.56. The motion was denied in all other respects. Importantly, and for purposes of this appeal, the JNOV was denied with respect to the Bertrands' request for an additional award of special damages to Talesha for loss of income. It was also denied with respect to the Bertrands' request for an increase of the general damage award to at least $150,000.00.

Accordingly, the Bertrands appeal assigning the following errors on the part of the trial court:

> (1)    the jury abused its fact-finding discretion in failing to award Talesha special damages for the nine-and-a-half-month loss of income resulting from her inability to return to work arising out of the unplanned fourth pregnancy resulting from Dr. Kudla's admitted malpractice; and

(2)    the jury abused its fact-finding discretion by awarding Talesha only $50,000.00 in general damages resulting from the physical and emotional effects of the unplanned fourth pregnancy resulting from Dr. Kudla's admitted malpractice.

## DISCUSSION

### Motion to Strike

At the outset, we address the Bertrands' Motion to Strike portions of the PCF's appellee brief.  The Bertrands contend that the PCF failed to answer this appeal, and it failed to file a separate appeal from either the judgment on the merits or the JNOV judgment.

Louisiana Code of Civil Procedure Article 2133 provides:

A.  An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant.  In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later.  The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer.  Additionally, however, an appellee may by answer to the appeal, demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court. . . .

B.   A party who does not seek modification, revision, or reversal of a judgment in an appellate court, including the supreme court, may assert, in support of the judgment, any argument supported by the record, although he has not appealed, answered the appeal, or applied for supervisory writs.

Despite the PCF's failure to answer the appeal, the Bertrands allege that in its appellee brief, the PCF addresses the jury's fault determination and argues that the Bertrands were partially at fault for not contacting Dr. Kudla.  The Bertrands contend, however, that the fault issue was resolved by the trial court in its ruling on

4

the JNOV motion. As such, the Bertrands allege that any discussion on this issue should be stricken from the PCF's appellee brief.

The Bertrands further contend that in the PCF's appellee brief, the PCF argues that the jury's award of some, but not all, of the stipulated past medical expenses was reasonable and should not be disturbed on appeal. The Bertrands allege that this error was also corrected by the trial court in its ruling on the JNOV motion. The Bertrands, therefore, contend that the PCF waived its right to argue for a modification of the JNOV by not answering the appeal or appealing the trial court's JNOV ruling.

We agree with the Bertrands and grant their Motion to Strike. We will only consider the arguments contained in the PCF's brief regarding the two issues which are before this court on appeal: the jury's failure to award Talesha past lost wages and the jury's general damage award.

**Special Damages**

In their first assignment of error, the Bertrands contend that the jury abused its discretion by failing to award Talesha lost wages for a period encompassing nine and a half months.[2] The Bertrands allege that special damages are warranted since Dr. Kudla's liability was admitted and established. The Bertrands contend that the uncontested documentary evidence and testimony support a lost wage award.

In opposition, the PCF as statutory intervenor, through the nominal Defendant Dr. Kudla, contends that Talesha is not entitled to loss of income considering the testimony of the bookkeeper for the family's automobile business,

---

[2] In their brief, the Bertrands contend that this nine-and-a-half-month period encompasses May 31, 2005, through March 15, 2006. The Bertrands allege that May 31, 2005, is the start date that Talesha would have returned to work approximately five months after having her third child.

5

Patricia Smith. The PCF alleges that Smith was unclear as to when or whether Talesha planned to return to work. Smith's testimony, according to the PCF, was also unclear as to the amount of income which her husband, James, was going to allocate to Talesha. The PCF alleges that Talesha testified, on cross-examination, she voluntarily stopped working so that she could raise her children. The PCF contends the foregoing supports the jury's determination that lost wages were not warranted.

In Louisiana, special damages "are those damages that can be established to a reasonable mathematical certainty" and "include awards for past and future lost earnings." *Cottle v. Conagra Poultry Co.*, 06-1160, p. 3 (La.App. 3 Cir. 3/14/07), 954 So.2d 255, 257-58. In order to recover actual wage loss, the supreme court has held that "a plaintiff must prove that he would have been earning wages but for the accident in question. In other words, it is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident." *Boyette v. United Servs. Auto. Assoc.*, 00-1918, p. 3 (La. 4/3/01), 783 So.2d 1276, 1279 (citations omitted). In *Thibeaux v. Trotter*, 04-482, p. 4 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, 1131, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31 (citations omitted), this court further held that:

> The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence. An award of special damages is reviewed pursuant to the manifest error standard of review, unlike a general damage award which is reviewed pursuant to the abuse of discretion standard. Thus, the "adequacy or inadequacy of the award should be determined by the facts or circumstances of the case under consideration.

As mentioned above, the trial court granted in part and denied in part the Bertrands' motion for JNOV which focused on four aspects of the jury's verdict.

6

With respect to this first assignment of error, the trial court denied the Bertrands' request to award special damages to Talesha for her loss of income.

In Louisiana, a motion for JNOV may be granted on the issue of damages, liability, or both. La.Code Civ.P. art. 1811(F). The criteria applicable to our review of the partial denial of the Bertrands' motion for JNOV was set forth by the supreme court in *Peterson v. Gibraltar Sav. & Loan*, 98-1601, 98-1609, pp. 5-6 (La. 5/18/99), 733 So.2d 1198, 1203 (citations omitted):

> JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, is so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Refusal to render a judgment notwithstanding the verdict (JNOV) can only be overturned if it is manifestly erroneous.

Therefore, the standard governing our review of the trial court's partial denial of the Bertrands' motion for JNOV is that of manifest error.

The record contains the testimony of Smith, who testified on behalf of the Bertrands. Smith stated that she began working for the Bertrands' automobile company in 2002 and was still working for them at the time of trial. Smith initially performed secretarial/clerical tasks and eventually began doing the company's bookkeeping. Smith testified that Talesha was working at the company until about October of 2004 when she stopped to give birth to her third child. This third child was born two months later, in December 2004, according to Talesha's testimony. Smith testified that Talesha made approximately $4,900.00 per month in 2004.

Smith testified that Talesha planned to return to work at some point in 2005 after having her third child. Smith indicated that Talesha did not return to work until 2011 and that her failure to return to work in 2005 arose out of her pregnancy

7

for her fourth child. Despite not returning to work, Smith testified that Talesha and her children "were in and out of the office all the time" in 2005. During these interactions in 2005 when Talesha was pregnant, Smith testified that Talesha "was pretty well overloaded."

Talesha testified at trial that she has four children: Acacia, who was born in 2001; Trey, who was born in December of 2002; Israel, who was born in December of 2004; and, Eden, who was born in January of 2006. Talesha testified that she began working for the family automobile business in the middle of 2004. Talesha began working because "[b]usiness was increasing, we needed more help in the office, and I knew about the business and it made the most sense for me to be there." Talesha stated that she earned approximately $4,900.00 per month for her work, which included submitting contracts, paying bills, managing the floor plans and title work, filing, and paperwork. Talesha stated that the last paycheck she received was in October of 2004 prior to returning to work in 2011.

Talesha testified that, in the spring of 2005, she became suspicious that she was pregnant because she "always felt sick." Her suspicions were realized on May 31, 2005, when Dr. Kudla confirmed her pregnancy. When questioned as to whether she returned to work in 2005, she testified: "I never went back to work officially. I was in and out of the office, of course. I was getting ready to return back to work, but I never did." She further testified that she was only asking the jury to award her $4,900.00 per month for the period of time during her fourth pregnancy when she was unable to work.

Talesha testified that she was never told by any physician that she could not return to work during her fourth pregnancy. When questioned as to why she failed to return to work after her third child, she replied: "Well, I was pregnant and I had

three small children. It would've been very strenuous for me to go to work." Other than gestational diabetes, Talesha testified that her pregnancy was "fairly normal."

On cross-examination, Talesha was questioned about her deposition testimony wherein she testified regarding her ability to handle her three children while pregnant with her fourth child. In that regard, the following colloquy took place between Talesha and the PCF's counsel:

> Q     Okay. Again, in that deposition that Mr. Bergstedt just went over with you, on page 23, line 23, I'm going to ask you to read for the jury the highlighted part starting with line 23.
>
> . . . .
>
> Q     (MR. ROWE) What does that say?
>
> A     I do not think that I could physically and emotionally handle the children I already had.
>
> Q     That's referring to the three children, correct?
>
> A     Correct, and this was after I became pregnant.
>
> Q     But your feelings about the children you already had was that you couldn't handle them, true?
>
> A     True.
>
> Q     And that's why you stopped working at the start of 2005?
>
> A     I stopped working at the end of 2004.
>
> Q     Right. That's why you stopped, because you were overwhelmed--
>
> A     Correct.
>
> Q     --with the three you had.
>
> A     Yes.
>
> Q     And you never went back to work until 2011, true?

A    Yes.

With respect to Talesha's plan to return to work after her third baby, her husband James testified at trial as follows:

> Well, the plans were is [sic] that she would get through the pregnancy, she would get herself reestablished, and we don't know what the time frames of that period are going to be, you know. You play it by ear. And so basically she would have a few months off and kind of re-gather herself and start to reenter the business on whatever level she could as she got, you know, better. We -- you know, from pregnancy to pregnancy you don't -- you know everything just doesn't happen in a canned way, you know. It's not like two weeks -- it's not like a cookie cutter approach, you know and I don't know what it's like to be a woman and have a baby just know that I'm a father of four kids and I have watched it and it changes. Things change.

Based on the foregoing evidence and testimony, Talesha met her burden of proving entitlement to special damages by a preponderance of the evidence. The testimonial evidence shows that Talesha planned to return to work in 2005 prior to finding out that she was pregnant with her fourth child. Specifically, Smith testified that Talesha planned to return to work in 2005 after having her third child. James testified that Talesha would "reenter the business" after having her third child. Talesha testified that she failed to return to work in 2005 because she was pregnant. Talesha and Smith testified that Talesha returned to work in 2011.

The testimonial evidence further shows that Talesha proved, by a preponderance of the evidence, her past lost earnings and the length of time missed from work due to the pregnancy. Specifically, Talesha and Smith testified that Talesha was earning approximately $4,900.00 per month in 2004. Talesha further testified that she was only seeking lost wages for the nine and a half months that she was pregnant for her fourth child.

In ruling on the Bertrands' motion for JNOV, the trial court was required to determine whether the foregoing evidence, viewed in the light most favorable to

the PCF, pointed so strongly in favor of the Bertrands that reasonable persons could not arrive at a contrary verdict on the issue of whether the Bertrands proved that Talesha was entitled to lost wages. The trial court, in its oral reasons for denying in part the Bertrands' motion for JNOV, stated that:

> Well, you know, that's the thing. Trying to get in the mind of the jurors is something that I don't like and I don't think it's appropriate for me to try to do in these circumstances. You know, there were a couple where I granted the JNOV. I felt like that was the only just thing that could really be done in this case under the law, and this matter, on the lost wages, I mean I think that was a discretionary matter for the jury to consider in light of all the evidence and the testimony. I mean there were credibility determinations that they had to make and maybe that was based on the credibility determination, but I don't think it's appropriate on that issue for me to change the jury's verdict.
>
> So I'm going to deny the JNOV on that issue.

We disagree. Given the testimony and evidence presented herein, there was not a reasonable basis for the jury's finding. Although the jury awarded special damages for medical expenses, we find that the jury was manifestly erroneous in failing to award additional special damages for lost wages. We further find that the trial court's denial of the Bertrands' motion for JNOV with respect to lost wages was manifestly erroneous. Therefore, we reverse the trial court's denial of the Bertrands' motion for JNOV regarding the lost wages issue and award Talesha lost wages in the amount of $46,550.00 ($4,900.00 x 9.5) representing the nine-and-a-half-month period from May 31, 2005 through March 15, 2006.

**General Damages**

In their second assignment of error, the Bertrands allege that the jury abused its discretion by awarding Talesha only $50,000.00 in general damages. The Bertrands contend that Talesha is entitled to at least $150,000.00 in general damages.

In opposition, the PCF contends that *Smith v. Clement*, 0l-87 (La.App. 3 Cir. 10/3/01), 797 So.2d 151, *writs denied*, 01-2878, 01-2982 (La. 1/25/02), 807 So.2d 249, 843, cited by the Bertrands and discussed below, is distinguishable from the facts in the present case. The PCF alleges that the jury's verdict in the present case is based upon the facts contained in the evidence.

In Louisiana, general damages are defined as:

> [T]hose which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life style which cannot be measured definitively in terms of money.

*Leyva v. Iberia Gen. Hosp. & Med. Ctr.*, 93-768, pp. 8-9 (La.App. 3 Cir. 5/24/95), 660 So.2d 486, 491, *writ denied*, 95-2731 (La. 1/26/96), 666 So.2d 674 (citations omitted). In *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994) (citations omitted), the Louisiana Supreme Court articulated the following standard for reviewing general damage awards:

> The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonable within that discretion.

Additionally, "[r]efusal to render a judgment notwithstanding the verdict (JNOV) can only be overturned if it is manifestly erroneous." *Peterson*, 733 So.2d at 1203.

In *Leyva*, 660 So.2d at 491 (citations omitted), this court held:

> A court of appeal may award damages in cases where the trier of fact initially rejected the plaintiff's demands and the record contains sufficient proof of damages. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the

award in an amount which is just compensation for the damages revealed by the record.

In *Leyva*, the plaintiff sued her physician for medical malpractice, alleging that he failed to ligate her left fallopian tube during a bilateral tubal ligation performed after the birth of her second child. After this first surgery, she underwent an exploratory laparotomy to determine whether the left tube was ligated. After this second surgery, the plaintiff alleged that the physician negligently failed to obtain a tissue specimen for pathological analysis and failed to verify that the left tube was properly ligated. As a result, the plaintiff alleged that she should be compensated for the pain and suffering caused by the exploratory laparotomy and the anxiety of not knowing whether she is sterile.

The trial court entered judgment on the jury verdict in favor of the physician. *Leyva*, 660 So.2d 486. On appeal, this court affirmed the trial court's judgment. The supreme court thereafter granted writs, and subsequently reversed and remanded. On remand, this court held that the physician was negligent during both surgical procedures and awarded the plaintiff $50,000.00 in general damages. This court stated:

> The record in the case sub judice shows that Ms. Leyva was hospitalized for one day after the laparotomy. She testified that the pain was "awful" for approximately two weeks and that she could not take care of her children during this time; her mother had to do everything for her. The scar on her lower abdomen, some three inches in length, is still very sensitive and is a painful reminder of the failed surgery. Ms. Leyva has been subjected to two surgical procedures to assure that she can bear no more children, yet even today, she remains uncertain whether she is sterile. Under the facts of this case, we find that $50,000 is an appropriate award of general damages, to include mental and physical pain and suffering.

*Leyva*, 660 So.2d at 491.

Since the plaintiff in *Leyva* received $50,000.00 in general damages approximately twenty years ago for an incomplete tubal ligation that failed to result in a subsequent pregnancy, the Bertrands contend that Talesha is entitled to more than $50,000.00 in general damages.

The Bertrands also contend that the jury unreasonably limited Talesha's general damage award following the birth of her fourth child. The Bertrands allege that this is evident since the jury did not award damages for loss of income and since they only awarded less than a third of the stipulated medical expenses in special damages. The Bertrands contend that this court must correct that error. The Bertrands ask this court to review *Smith* for guidance on an appropriate amount of general damages for the pain, injuries, damages, and inconvenience suffered by Talesha.

In *Smith*, 797 So.2d 151, the plaintiffs filed a medical malpractice claim against the patient's physician. The plaintiffs contended that the physician failed to properly perform a bilateral tubal ligation and failed to verify that the surgery was properly performed. The trial court entered a default judgment against the physician and denied his motion for new trial. The PCF intervened in the physician's appeal. This court affirmed the trial court's judgment. Notably, the trial court awarded the plaintiffs a lump sum of $192,749.05. This award included $23,891.00 in medical expenses related to the undesired pregnancy and delivery. Although this general damage award was not itemized, the husband received $25,000.00 for loss of consortium.

The Bertrands contend that the general damage award in *Smith* of approximately $145,000.00 ($192,749.05 - $23,891.00 - $25,000.00 = $143,858.05)

14

was made more than ten years ago. As such, the Bertrands allege that $145,000.00 should represent the lowest possible award of general damages in the present case.

In *Smith*, 797 So.2d 158, we made an award based on the following:

> Mr. and Ms. Smith took steps to insure that they did not have any more children after their second child was born in August 1996. Not only were they surprised to learn that Ms. Smith was pregnant, they were not in a financial position that allowed them to deal with the prospect of another child easily. Their living quarters were too small. Neither of their vehicles was large enough to accommodate another child. During the pregnancy, an ultrasound indicated that there might be a problem with the baby. Ms. Smith was depressed during much of the pregnancy which affected her relationship with her husband and their children. She felt like she was not there for them when she should have been. Additionally, the baby was breach and had to be delivered by C-section which increased Ms. Smith's recovery time. Under the facts presented, we find no abuse of discretion by the trial court.

The record in the instant case contains the trial testimony of Dr. Stephen Schorr, Talesha's treating obstetrician for her fourth pregnancy. As to whether Talesha was considered high-risk, he testified that "she really didn't have a high risk diagnosis until she had an abnormal blood sugar . . . but even that, I mean she was class A-l, so she wasn't by any means . . . the typical high risk patient that we would see in our practice." When asked whether he placed any physical restrictions on Talesha during her pregnancy, Dr. Schorr responded: "Nothing outside of the ordinary." Dr. Schorr testified that they induced labor when she was thirty-nine weeks pregnant. Dr. Schorr stated that Talesha had a vaginal birth and that he could not recall any complications she may have experienced after birth. Dr. Schorr discussed the need for Talesha to return at a later date to undergo a tubal ligation, which was performed under general anesthesia.

Talesha testified that she was "really devastated" and she was "in shock" when she found out that she was pregnant for her fourth child. She testified that

15

she was sick during this pregnancy. She was "tired and emotionally messed up." Talesha testified that during her third trimester, she was "on the verge" of having gestational diabetes and "had to see a dietician." She further testified that she felt that she was on an "emotional roller coaster." Some days she would be upset, and some days she would be excited. Talesha testified that she had a "fairly normal pregnancy." Talesha experienced painful contractions before getting an epidural. Talesha also testified that she had concerns about being a mother to her three children while pregnant with her fourth child, and she felt that her other children were "in some ways" neglected during that time.

James testified that he initially told Talesha that she could not be pregnant for her fourth child since she had a tubal ligation after her third child. During this fourth pregnancy, James testified that Talesha "kept visiting the trauma and the results and the experience" and that "life became a roller coaster." He stated that Talesha "was mostly unstable" during the beginning of her pregnancy. James testified that he felt animosity from Talesha during this pregnancy.

After our review of the testimony in the present case, we find many similarities between the facts in this case and the facts in *Smith*. Just like in *Smith*, the Bertrands took steps to insure that they did not have any more children after the birth of their third child. Specifically, Talesha underwent a tubal ligation performed by Dr. Kudla. Just like in *Smith*, Talesha's tubal ligation was incomplete. Just like in *Smith*, the Bertrands were surprised to learn that Talesha was pregnant with her fourth child. Just like in *Smith*, Talesha was depressed during much of the pregnancy which affected her relationship with her husband and their children.

16

The facts in the present case are also similar to *Leyva* in that both the plaintiff in *Leyva* and Talesha had a failed tubal ligation. Importantly, the failed tubal ligation in *Leyva* did not result in the birth of another child whereas the failed tubal ligation in the present case resulted in the birth of another child. Under the facts presented in this case, we find an abuse of discretion by the trial court in denying an increase in the jury's general damage award of $50,000.00 to Talesha.

In ruling on the Bertrands' motion for JNOV, the trial court was required to determine whether the foregoing evidence viewed in the light most favorable to the PCF pointed so strongly in favor of the Bertrands that reasonable persons could not arrive at a contrary verdict on the issue of whether the Bertrands proved that Talesha was entitled to an increase in general damages. The trial court, in its oral reasons for denying in part the Bertrands' motion for JNOV, stated that:

> [B]ut a jury has so much discretion. I can't . . . substitute my judgment for that of the jury . . . .
>
> I don't feel comfortable changing that because the jury, out of everything, they may have felt that 50,000 was appropriate . . . and that . . . she had a happy, healthy baby and that helps offset a lot of the negative. . . . So I'm going to deny that.

We disagree. Given the testimony and other evidence presented herein, there was not a reasonable basis for the jury's finding. Thus, we find that the trial court abused its discretion in denying the Bertrands' motion for JNOV regarding an increase in general damages. We therefore reverse the trial court's denial of the Bertrands' motion for JNOV on this issue and award general damages in the amount of $150,000.00.

## DECREE

The July 16, 2013 judgment notwithstanding the verdict rendered by the trial court denying an additional award of special damages for lost wages is reversed.

17

We hereby award Talesha Bertrand the amount of $46,550.00 representing lost wages from May 31, 2005 through March 15, 2006. We further reverse the trial court's denial of an increase in general damages to Talesha Bertrand and increase the award to $150,000.00. All costs of this appeal are assessed against the Louisiana Patient's Compensation Fund.

**REVERSED IN PART AND RENDERED.**