NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-103


FRANK COLLATT AND JENNIFER CORREIA

VERSUS

BARBARA T. BOUDREAUX, ET AL.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-2014-5830
HONORABLE DAVID M. SMITH, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


CANDYCE G. PERRET
JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Elizabeth A. Pickett, D. Kent Savoie, and Candyce G. Perret, Judges.


REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART;
AND RENDERED.

Brian M. Caubarreaux
Laura B. Knoll
Eugene A. Ledet, Jr.
Brian Caubarreaux & Associates
144 Tunica Drive West
Marksville, LA  71351
(318) 253-0900
COUNSEL FOR PLAINTIFF/APPELLANT:
      Jennifer Correia

**F. Douglas Wimberly**
**Cloyd, Wimberly & Villemarette, LLC**
**Post Office Box 53951**
**Lafayette, LA  70505-3951**
**(337) 289-6906**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **State Farm Mutual Automobile Insurance Company**
     **Barbara T. Boudreaux**

**J.P. D'Albor**
**Haik, Minvielle & Grubbs**
**1017 East Dale Street**
**Post Office Box 11040**
**New Iberia, LA  70562-1040**
**(337) 365-5486**
**COUNSEL FOR INTERVENOR:**
     **Lafayette Surgical Hospital, LLC**

**PERRET, Judge.**

Plaintiff, Jennifer Correia, appeals the trial court's judgment on her Motion for Judgment Notwithstanding the Verdict ("JNOV") and Motion to Tax Costs rendered on April 11, 2019, which modified a jury verdict rendered on May 2, 2018. Ms. Correia challenges the adequacy of the general damages awarded. On appeal, we increase Ms. Correia's total general damages.

**FACTUAL AND PROCEDURAL BACKGROUND:**

This court previously set forth the facts of this case as follows:

Correia and Frank Collatt (Collatt)[1] filed suit against Barbara T. Boudreaux (Boudreaux) and her insurer, State Farm Mutual Automobile Insurance Company (State Farm), following an automobile accident that occurred on December 5, 2013. The vehicle being driven by Correia and occupied by Collatt as a guest passenger was stopped in the drive-through lane at the Chick-Fil-A on Ambassador Caffery Parkway in Lafayette, Louisiana, when it was rear-ended twice by the vehicle that Boudreaux was driving.

A review of the record reveals the following facts. . . . Correia and Collatt filed a motion for summary judgment, which was not opposed by the defendants, and the trial court entered judgment finding Boudreaux one hundred percent at fault in causing the accident. . . .

Correia's claims proceeded to trial by jury, and a verdict was returned in her favor. She was awarded $ 120,960.04 for past medical expenses; $ 120,000.00 for future medical expenses; $ 50,000.00 for past mental and physical pain and suffering; $ 50,000.00 for future mental and physical pain and suffering; $ 41,600.00 for past lost wages; $ 20,800.00 for future lost wages; and $ 40,000.00 for permanent disability. The jury did not award Correia any damages for permanent scarring and disfigurement or for loss of enjoyment of life. A judgment in accordance with the jury's verdict was signed by the trial court.

Thereafter, Correia filed a motion for judgment notwithstanding the verdict which was set for contradictory hearing on August 6, 2018. At the conclusion of the hearing, the trial court awarded Correia $ 15,000.00 for scarring and disfigurement, $ 25,000.00 for loss of enjoyment of life, and otherwise left untouched the damages awarded by the jury. Counsel for Boudreaux and State Farm was ordered to

---

[1] Frank Collatt's claims were settled prior to trial and are not at issue in this appeal.

prepare a judgment. On September 17, 2018, the trial court signed the judgment presented to it. . . .

. . . .

The defendants did not appeal either judgment. Correia filed a motion for devolutive appeal of "the original Judgment rendered by the jury and signed by the presiding judge on May 24, 2018, as well as the Judgment Notwithstanding the Verdict signed on September 17, 2018." When the record was received by this court, we discovered that the September 17, 2018 judgment did not state the relief granted or denied, nor did it name the parties cast in judgment. Thereafter, we ordered Correia to show cause why the appeal should not be dismissed as having been taken from a judgment that lacked proper decretal language.

*Collatt v. Boudreaux*, 19-103, pp. 1-2 (La.App. 3 Cir. 3/13/19) (unpublished opinion) (footnotes omitted).

This court suspended the appeal and remanded the matter back to the trial court with instructions to enter a judgment with proper decretal language. The trial court amended the September 17, 2018 JNOV by a judgment signed on April 3, 2019. However, that judgment also did not contain proper decretal language. *See Collatt v. Boudreaux*, 19-103 (La.App. 3 Cir. 5/1/19) (unpublished opinion). This court suspended the appeal a second time and remanded to the trial court with instructions. The latest judgment, signed on April 11, 2019, now contains proper decretal language.

On appeal, Ms. Correia asserts one assignment of error: (1) "The Trial Court abused its discretion in awarding *total* general damages of only $180,000.00 for *two* major spinal injuries, both requiring surgery, as well as diagnosed temporomandibular joint disorder ["TMD"], loss of enjoyment of life, and 50-60 percent permanent whole body impairment." Ms. Correia also presents an additional issue for review: "What is the lowest reasonable amount of general damages for the aforementioned significant injuries based on current jurisprudence?"

In contrast, Defendants assert, as they did at the JNOV hearing, that the jury concluded that Ms. Correia was not credible in her testimony and, thus, awarded the current general damages award, citing to *Wainwright v. Fontenot*, 00-492, (La. 10/17/00), 774 So.2d 70, for support. For the following reasons, we increase the total general damage award, which requires reversing the trial court's partial denial of the motion for JNOV and affirming as amended the trial court's partial grant of the motion for JNOV.

**STANDARD OF REVIEW:**

As mentioned above, the trial court granted Ms. Correia's JNOV in part and denied it in part. "In Louisiana, a motion for JNOV may be granted on the issue of damages[.]" *Bertrand v. Kudla*, 14-61, 14-62, p. 7 (La.App. 3 Cir. 6/4/14), 139 So.3d 1233, 1238, *writ denied*, 14-1447 (La. 10/10/14), 151 So.3d 584; *see also* La.Code Civ.P. art. 1811(F). "General damages are those which may not be fixed with pecuniary exactitude; instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'" *Duncan v. Kansas City S. Ry. Co.*, 00-66, p. 13 (La. 10/30/00), 773 So.2d 670, 682 (quoting *Keeth v. Dep't of Pub. Safety & Transp.*, 618 So.2d 1154, 1160 (La.App. 2 Cir. 1993)). "The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration." *Falcon v. La. Dep't of Transp.*, 13-1401, p. 16 (La.App. 1 Cir. 12/19/14), 168 So.3d 476, 489, *writ denied*, 15-133 (La. 4/10/15), 163 So.3d 813. The trier of fact has vast discretion in fixing general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

Louisiana Code of Civil Procedure controls the use of JNOVs, but the criteria governing when one is proper has been set forth by the jurisprudence, such as in

*Joseph v. Broussard Rice Mill, Inc.*, 00-0628, pp. 4-5 (La. 10/30/00), 772 So.2d 94, 99:

> [A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. *Scott* [*v. Hosp. Serv. Dist. No. 1*]*,* 496 So.2d [270,] 274 [La.1986]. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *Anderson v. New Orleans Pub. Serv., Inc.,* 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact." *Scott,* 496 So.2d at 273; *Jinks v. Wright,* 520 So.2d 792, 794 (La.App. 3 Cir.1987).

Furthermore, "[i]f the trial court determines that a JNOV is warranted, it conducts a de novo review of the evidence to arrive at an appropriate award." *Pike v. Calcasieu Par. Sch. Bd.*, 18-996, p. 9 (La.App. 3 Cir. 5/15/19), 272 So.3d 943, 951.

> In reviewing a JNOV, the appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. *Anderson,* 583 So.2d at 832.

*Joseph*, 772 So.2d at 99.

Thereafter, if there is no error as to the grant of a JNOV, the appellate court considers whether the trial court abused its discretion in arriving at an appropriate award. *Pike*, 272 So.3d 943. However, a trial court's "[r]efusal to render a judgment notwithstanding the verdict (JNOV) can only be overturned if it is manifestly

erroneous." *Peterson v. Gibraltar Sav. & Loan*, 98-1601, 98-1609, p. 6 (La. 5/18/99), 733 So.2d 1198, 1203.

**DISCUSSION:**

Ms. Correia assigns as error the trial court's award of general damages, asserting that the total amount of general damages awarded is abusively low. It is worth noting that Ms. Correia is only challenging general damages. There is no answer to appeal, and neither party challenges causation. After reviewing the record and exhibits, we find merit in Ms. Correia's argument that the trial court erred in partially denying her motion for JNOV and abused its discretion in its award of general damages following its partial grant of JNOV.

At trial, Ms. Correia testified that the collision occurred when she was stopped in a Chick-Fil-A drive-through lane in her Grand Marquis and that Ms. Boudreaux, in her Toyota Sequoia, "slammed into me, slammed my car into the car in front of us, backed up, hit the car behind her, put it into drive again and hit me a second time." She explained that the collision caused her to jerk forward and then hit the headrest. She further testified that the collision also caused her car to collide with the car in front of her and that the occupants of that car "got out of their car, they looked at their bumper. It was during lunch hour, so they got back in their car and left." Furthermore, "the person who she [Ms. Boudreaux] hit behind her honked but left." Afterwards, Ms. Correia testified that she experienced pain and sought treatment with her regular treating nurse practitioner, Diana Verdelor, FNP, and chiropractor, Dr. James Griffin. However, as her pain progressively worsened, she sought treatment with Dr. Keith Mack, general practitioner, on July 17, 2014, but was ultimately referred to an orthopedic surgeon, Dr. Louis Blanda, Jr. Ms. Correia reported "neck and back aches, numbness in arms and hands, back spasms, neck paralyzed, pressure between shoulder blades." Ms. Correia testified that she tried

5

physical therapy, dry needling, and neck stretching, TENS Unit, heating pads, and essential oils to no avail. Instead, her problems got worse. She had "hand issues. Couldn't open up water bottles. The radiating pain was excruciating. I was in bed so much." Dr. Blanda recommended a two-level anterior cervical discectomy and fusion surgery at C5-6 and C6-7.

Ms. Correia underwent surgery on July 15, 2015. After surgery, Ms. Correia testified that her pain is better, but that there is "still so much pain." She testified that her hands are numb all the time, her feet get numb, and that several fingers stay numb. She also testified that she had to wear neck and back braces and use a walker. The neck brace often required her to sleep in a recliner. She testified it was difficult to walk at the store and she "would have to decide whether or not I'd want to get milk today or if I had the energy to." Ms. Correia explained that she took strong pain medication because she needed to block the pain, but the medication caused her to have some memory loss, leaving her in a daze, and resulted in a loss of energy. She testified that she went through depression, for which she saw a doctor.

The surgery left a scar on her neck, which she showed to the jury. She testified she puts makeup on and wears chokers to cover the scar, but people still notice and ask her about it. After surgery, Ms. Correia also began experiencing TMJ (temporomandibular joint)/TMD symptoms. Ms. Correia testified that she had swelling and pain in her ear and that she could not yawn, cough, or open her mouth up wide without feeling a stabbing pain. Therefore, she sought treatment with James Pearce, D.D.S, F.A.G.D., and Craig Landry, D.D.S.

Although Ms. Correia testified that she is doing better after the cervical surgery, she still experiences radiating numbness and spasms, but can function. She also notes that "probably 80 percent of the time at night" she wakes up "at 2:00 or 3:00 in the morning to take my meds because the pain wakes me up. I'll have

shooting pains down my arm, stiff neck." Her back continues to be an issue, and she is hesitant about lumbar surgery following her cervical surgery recovery experience. Instead, she has received a Lumbar Epidural Steroid Injection (LESI).

Ms. Correia testified that, prior to the crash, she was an "avid walker, walked three, five, seven miles a day. Physical, did water parks, one of my favorite things. Water parks, jumping into spring waters in Texas. My life completely took a different path. I'm not the same person physically that I was." Ms. Correia missed watching her daughter play softball because she could not tolerate sitting in the bleachers. At the time of the collision, she worked the tax season at Jackson-Hewitt. After the collision, she continued this work until the end of the tax season in 2014 but could not manage to continue working there. She now works at a café where she stays moving, which helps her avoid thinking about the pain and prevents stiffness. Additionally, post-collision, she does not walk as much and tries to do yoga. She also believes she will try to swim again but has not done so yet.

Ms. Correia testified that she was involved in a prior automobile accident in September of 2012, for which she treated with Dr. Griffin. She reported to Dr. Griffin nine days after the incident with back pain and a stiff neck that interfered with sleeping, her daily routine, and recreation. It was painful for her to sit, stand, walk, bend, and lie down. However, she testified that she got better and her last "maintenance" appointment with him was approximately one month before the current collision. In fact, she testified that she went several months without a visit, but after doing a lot of gardening over the summer, she returned for some adjustments. Ms. Correia testified that the 2012 incident occurred when another vehicle collided with her vehicle in the parking lot and "kind of moved the car a little bit." On the contrary, the current 2013 incident she described as "a doozy[]" and further explained, "I've never been in a position where I can't even explain to most

people the damage done to my spine. The numbness, the pain that shoots down my leg, shoots down my feet, shoots down my fingers, the stiffness."

On cross-examination, Ms. Correia testified that she reported to Dr. Griffin that Ms. Boudreaux "sped around corner and rear-ended vehicle." However, she admitted that she did not see Ms. Boudreaux coming. Defendants submitted a "Vehicle Accident Information" form wherein Ms. Correia described her pain immediately following the collision as feeling "like someone punched me in the center of my back between shoulder blades." Ms. Correia also discussed her prior accident in 2012. She described the 2012 accident in Dr. Griffin's paperwork as occurring when her "car was struck very hard and the force pushed vehicle sideways in middle of road."

Contrary to Ms. Correia's testimony, Ms. Boudreaux testified that she only collided with Ms. Correia's car once, and that she did not contact the car behind her. She testified that she was in bumper-to-bumper cars in the drive-through waiting to order with her foot on the brake. She dropped her wallet, and when she reached for it, her foot slipped from the brake, and her car hit Ms. Correia's vehicle. She immediately reapplied the brake, turned off the ignition, and went to check on Ms. Correia. Upon reaching her window, Ms. Boudreaux claims that Ms. Correia got out of her car, said her passenger was about to have surgery, and began taking pictures of the vehicles.

The records from Dr. James Griffin indicate that Ms. Correia sought treatment following both the 2012 and 2013 collisions. As to the 2012 collision, Ms. Correia was treated from September 19, 2012 to November 6, 2013. Her appointments decreased from twelve in October of 2012, to only one in November 2013. In fact, she received no treatment by Dr. Griffin from June 2013 through the end of September 2013. At her first visit following the 2012 collision, the records indicate

that Ms. Correia's chief complaint was "Stiffness in the muscles of the posterior neck, the thoracic paravertebral muscles, and the muscles of the lumbar spine." Her pain was rated as a seven out of ten. Dr. Griffin ordered an anteroposterior and lateral x-ray exam on September 19, 2012. The "Clinical Impression(s)" on the Imaging Report note:

> 1.) Degenerative joint disease is seen on the anterior and lateral endplates of the 6th to 7th cervical; 7th-9th thoracic; 3rd to 4th lumbar vertebrae.
>
> 2.) Mild osteophytes are displayed on the anterior aspect of the 7th to 9th thoracic; 6th to 7th cervical vertebrae.
>
> 3.) Hypolordosis of the cervical spine is seen.
>
> 4.) Possible disc protrusion at the 3rd lumbar intervertebral disc is suggested.

On her last visit prior to the 2013 collision, Ms. Correia's chief complaints were listed as "Tightness in: the muscles of the lumbar spine. Tenderness in: the sacroiliac joint on the right. Pain in: the muscles of the lumbar spine." Her overall condition was noted as stable.

Thereafter, Ms. Correia did not see Dr. Griffin again until February 5, 2014, following the December 2013 collision at issue in this case. At that initial exam, Ms. Correia's chief complaints were:

- Pain in: the thoracic paravertebral muscles.

- Pain in: the muscles of the upper back and the muscles of the posterior neck.

- Pain in: the muscles of the lumbar spine.

- Spasms in: the muscles of the thoracic spine and the muscles of the upper back.

- Stiffness in: the muscles of the posterior neck, the muscles of the thoracic spine, and the muscles of the lumbar spine.

- Tenderness in: the muscles of the thoracic spine.

- Tightness in: the muscles of the upper back.

Dr. Griffin noted in his objective examination: "Pain or tenderness to palpation was found in C7, T7, L5, and S1. Increased or changed tone in the associated muscles and fascia was identified in L5, T7, and C7." Additionally, Dr. Griffin ordered an anteroposterior and lateral x-ray exam on February 5, 2013. The "Clinical Impression(s)" on the Imaging Report note:

1.) Possible disc protrusion is seen at the 5th lumbar intervertebral disc.

2.) Hypolordosis of the cervical spine.

3.) Degenerative joint disease is oberseved on the anterior and lateral endplates of the 6th-7th cervical; 7th to 9th thoracic; 3rd to 4th lumbar vertebrae.

4.) Mild osteophytes are revealed on the anterior aspect of the 6th to 7th cervical; 7th to 9th thoracic vertebrae.

Ms. Correia began seeing Dr. Mack when she continued to have pain. Dr. Mack's records report a restricted range of motion in Ms. Correia's neck, as well as pain radiating towards both shoulders and down her left arm towards her fingers. Dr. Mack sent Ms. Correia for cervical, thoracic, lumbar, and shoulder x-rays as well as MRI scans. According to his records, after Dr. Mack could not offer Ms. Correia any further treatment, he recommended she see an orthopedic surgeon.

Ms. Correia was thereafter treated by Dr. Blanda and presented Dr. Blanda as an expert in orthopedic surgery. Dr. Blanda treated Ms. Correia beginning on August 21, 2014. After viewing her MRIs, Dr. Blanda testified that Ms. Correia had a significant herniated disc at C5-6, another herniation with some instability at C6-7, and a herniation or a protrusion at L5-S1. Although Dr. Blanda admitted that you cannot tell when a disc was herniated by the MRI, an MRI is ordered once a patient's symptoms mandate an MRI. Dr. Blanda testified that it was not until after the 2013

10

incident that an MRI was ordered for Ms. Correia, despite the fact she experienced some muscular neck and back pain prior to this event:

> Q.     Dr. Blanda, albeit we can't say that this disc that is on this film is herniated on last Tuesday or the Tuesday before that, that's where the clinical physician - - there's a lot of people that you see walk in there with back pain and you never order an MRI on them, right?
>
> A.     Right.
>
> Q.     Because they don't have the symptoms that mandate that you do order an MRI?
>
> A.     Correct.
>
> Q.     And if somebody goes to a doctor with all this radicular nerve pain, those doctors are taught to order tests like that to see what they're dealing with?
>
> A.     Yes.
>
> Q.     Okay.  That wasn't done with Ms. Correia until after this accident, even though she had before this accident some muscular neck and back pain?
>
> A.     That's right.

Dr. Blanda saw Ms. Correia twenty-five to thirty times and made a recommendation for anterior cervical discectomy and fusion surgery after objective findings indicated the need for surgery, such as an Electromyogram (EMG) test that indicated nerve damage/deficit and his objective findings during his physical exam of Ms. Correia during which he observed muscle spasms.  Ms. Correia underwent the cervical surgery in July 2015.  Dr. Blanda explained that an anterior cervical discectomy and fusion surgery removes "the disc where it's pressing on the spinal cord and the nerves and then to fuse it with a cage or bone graft."  For Ms. Correia, this was done at two levels.  In Dr. Blanda's opinion, a patient typically takes one year, sometimes more, to heal from this surgery.  He testified that Ms. Correia's neck gradually improved, but clarified, "we don't really expect a hundred percent symptom relief, but 80 or 90 percent improvement is usually very good for a

patient." Dr. Blanda further explained, generally, that the muscles guarding the neck are very weak. Therefore, it does not take tremendous force to damage the neck.

For her back, Ms. Correia has received Depo-Medrol injections and an LESI. Dr. Blanda explained that a Depo-Medrol injection is a "Cortizone [sic] or steroid[,]" that stops "inflammatory changes." Dr. Blanda's focus initially was on Ms. Correia's neck, and after surgery, he focused on her back pain. Around February 2017, Dr. Blanda diagnosed Ms. Correia with retrolithesis Grade 1, L5-S1, which showed up on a more recent MRI. Dr. Blanda explained that retrolisthesis "means that the vertebra slips[.]" Dr. Blanda believes Ms. Correia may require a two-level lumbar fusion in the future, which has a similar recovery time and cost to the cervical surgery. The lumbar fusion would require rods and screws, which would then be bone grafted like the cervical fusion. Dr. Blanda opined that, in the future, he would refer Ms. Correia to pain management for medication as well as occasional physical therapy or injections. Dr. Blanda testified that Ms. Correia has a fifty to sixty percent disability rating—twenty percent on the back and thirty percent on the neck.

Regarding Ms. Correia's TMJ symptoms, Dr. Blanda testified that Ms. Correia first presented with these symptoms after her cervical surgery. He further testified that being in a neck collar may cause TMJ: "I mean, patients after surgery, we like to keep them in the neck brace and that presses on the jaw and can cause TMJ." He noted that Ms. Correia was required to wear a neck brace for about six weeks after her cervical surgery. In August 2015, Dr. Blanda referred Ms. Correia to Dr. Pearce for her TMJ issues. Dr. Blanda testified that he sees TMJ issues very often and that they are "often related to the neck . . . it causes the tension in the jaw and they often go hand-in-hand."

On cross-examination, Dr. Blanda admitted that, upon her first visit, Ms. Correia indicated no previous back injury in one place on his forms but noted that in

another, she marked that she had previous back problems. Dr. Blanda explained that his charts can be confusing in that the difference between injuries and back problems is not well explained. Dr. Blanda further testified that although Ms. Correia's records show her pain levels have not changed post-cervical surgery, her physical exam is better. He seemed unperturbed by Ms. Correia's unchanging pain levels when he stated, "[P]ain is, again, kind of relative. You know, I hate to compare it to a woman having a baby, but you know, it's pretty painful obviously. But there's so much joy afterwards that they don't often remember how painful the experience was, so it can be different with different patients."

For her TMJ symptoms that presented after her cervical surgery, Ms. Correia had one visit with Dr. Pearce on September 14, 2015, for bilateral jaw pain and headaches. Dr. Pearce noted that his examination showed "myofascial pain of her muscles of mastication, her jaw muscles, on both sides of her head, face, and her neck." Dr. Pearce recommended splint therapy, but first recommended that Ms. Correia have her teeth cleaned and a cracked filling repaired.

Dr. Craig Landry also treated Ms. Correia for her TMJ pain. Dr. Landry testified as Ms. Correia's expert in general dentistry regarding the field of TMJ/TMD. Ms. Correia sought treatment from Dr. Landry on February 8, 2016, for a broken tooth and root canal referral. After both issues were disposed of, Ms. Correia continued to complain of jaw and face pain as well as headaches. After an exam consisting of both objective and subjective parts, Dr. Landry required Ms. Correia to wear a splint to address the TMJ issues. Although Dr. Landry did not review Ms. Correia's dental records prior to 2013 and Ms. Correia did not mention a neck injury prior to 2013, Dr. Landry noted she told him that she had never had this type of pain before. Dr. Landry further testified that Ms. Correia's TMJ issues were likely caused by the change in her head posture following her neck injury and,

13

especially, neck surgery. However, he noted that he did not get very far with Ms. Correia's treatment because her appliance broke and she stopped treatment thereafter. He also could not say whether Ms. Correia would be a chronic-type pain person, or whether her pain would resolve with treatment.

Dr. Landry also addressed Defendant's dentistry expert's, Dr. Kenneth Dubois, opinion. Dr. Landry reviewed Dr. Dubois' findings and found them to be the same as those during his own examination. Dr. Landry noted the only difference was that Dr. Dubois felt that, despite his findings, Ms. Correia was exaggerating her symptoms. Dr. Landry stated:

> I just don't know how he came to that conclusion. I mean, when you physically palpate someone's muscle that's not painful you don't get a reaction from it. When you physically palpate a muscle that is painful, it's easy to figure out, someone backs away. So that was the only thing that jumped out at me, was that he made a comment that he felt like she was exaggerating her symptoms. And then he went on to say she was sensitive to palpation everywhere I palpated on her - - on her face.
>
> . . . .
>
> And he said these are not typical findings on examination, that's what he said.
>
> Q.    Are they typical?
>
> A.    Yeah, I mean, it was exactly typical, so I was confused by that. He basically spelled out why she has TMJ symptoms by the examination, but then said he thinks she's exaggerating, they're not typical. To me it contradicted what he found.

Ms. Correia also presented the testimony of Dr. David Barczyk, an expert in the field of chiropractic medicine, biomechanics, and accident reconstruction. Prior to rendering an opinion, Dr. Barczyk was given Ms. Correia's records from Dr. Griffin, before and after the 2013 collision. Dr. Barczyk recalled that the pre-2013 collision records indicated that she had a "neck sprain and a lower back sprain" from a prior collision. He also interviewed Ms. Correia and examined her vehicle, although Dr. Barczyk did admit that he relied on Defendant's expert's photographs

14

and measurements in his calculations. Dr. Barczyk testified that he calculated Ms. Correia's car to have had a five mile per hour change in velocity when it was hit, for which tests have proven can cause a head acceleration of an occupant of five and one-half g's. He made this determination based on the compression of one of her vehicle's isolators, which he testified were compressed three eighths of an inch. He also testified that speed or velocity of the impact is not all that is important in these situations, so is how fast that speed change occurs.

On cross-examination, Dr. Barczyk testified that the black box of Defendant's vehicle did not record an event and that it would not record an event with less than a 3.3 mile per hour velocity change in a barrier test. However, he noted that velocity change is higher for a car-to-car crash setting, as was the case in this collision. Therefore, the necessary velocity change to record an event in a car-to-car collision would equal a velocity change that is one-and-one half to two times the necessary barrier test velocity change.

Kelley Adamson, Defendant's expert in the field of occupant kinematics, accident reconstruction, and biomechanics, testified that he calculated this collision as a one mile per hour delta-v (velocity change) collision, differing from Dr. Barczyk. A one mile per hour delta-v would equate to "less than two miles per hour, which is about the speed of the vehicle if you release - - if you let your foot off of the accelerator and begin to roll forward, that's probably about the speed that you would keep it up to." This calculation was based on his inspection of Ms. Correia's isolators, which are designed to fully compress, a compression of two inches, for a four mile per hour delta-v. His inspection indicated there was no compression of the isolators, again, differing from Dr. Barczyk's conclusion. Additionally, Mr. Adamson testified that the gravitational force on Ms. Correia would be "less than

15

one g[,]" and compared that to sneezing for which "head accelerations have been measured for sneezing at five g's."

Dr. William Brennan testified for Defendants as an expert in the field of neurosurgery. Dr. Brennan did a medical records review in this case instead of a physical examination of Ms. Correia. He agreed that Ms. Correia had cervical issues that needed to be treated and found Dr. Blanda's procedure appropriate. However, he did note that prior to the incident at issue, "the clinical picture of the patient is strikingly similar to after the subject accident."

Lastly, Dr. Kenneth Dubois testified as an expert in the field of general dentistry and treatment of TMD/TMJ for Defendants. Dr. Dubois performed a physical exam and interview of Ms. Correia. He noted that she reported pain everywhere he touched, which he considers atypical. He testified that it is unusual that her pain would be bilateral and affect everything. He further noted that her headaches were reportedly all over, whereas TMJ headaches are typically in the temporal area. Dr. Dubois concluded, "I felt like she was exaggerating her symptoms."

On the motion for JNOV, the trial court was required to determine whether the evidence, when viewed in the light most favorable to Defendants, pointed so strongly in favor of Ms. Correia that reasonable persons could not arrive at a contrary verdict on whether Ms. Correia was entitled to an increase in general damages. *Peterson*, 733 So.2d 1198. The trial court gave no reasons for its partial denial of Plaintiff's motion for JNOV regarding past mental and physical pain and suffering, future mental and physical pain and suffering, or permanent disability damages.

The record in the instant case shows that the jury awarded $120,960.04 in past medicals expenses—the amount Ms. Correia admitted into evidence as her "Medical Profile." Additionally, the jury awarded future medical expenses in the amount of

16

$120,000.00. This court notes that Dr. Blanda testified a future lumbar surgery would be similar in cost to the cervical surgery and that Ms. Correia would likely also need pain management. Therefore, the jury found Defendants liable for past and future medical expenses related to the accident at issue.

Ms. Correia's testimony was that she hurts all the time, takes pain medication every day, and that her pain levels have not changed. She suffered for twenty months before undergoing cervical spine surgery to help alleviate her problems, and Dr. Blanda testified that the recovery for that surgery is approximately one year. Additionally, since the accident in December of 2013, Ms. Correia has been experiencing pain in her lumbar spine, which may ultimately require surgery with its own recovery time. On top of her spinal issues, Ms. Correia has also been suffering from TMJ/TMD pain since her cervical surgery, which she testified causes her headaches and facial pain.

Defendants attempt to attack Ms. Correia's credibility with her description of the prior 2012 collision and by suggesting that Ms. Correia exaggerated the collision and her pain. Ms. Correia testified continuously that her pain from the 2012 accident had resolved and that she only saw Dr. Griffin for some maintenance. Her records from Dr. Griffin show that she had a four-month hiatus in visits, returning in October and once in November 2013. Ms. Correia explained that those visits were for maintenance and that, after doing a lot of gardening in the prior months, she needed some adjustments. Additionally, she explained that the 2013 pain was different from that following the 2012 collision, noting that she experienced numbness in her extremities. Although it appears the 2012 accident may have involved more movement of her vehicle than her original testimony suggested, Ms. Correia's description of the 2013 collision as a "doozy[,]" was appropriate as depicted by her description of the subsequent pain and medical treatment she endured compared to

17

the 2012 collision. Comparatively, Ms. Correia only sought chiropractic care for her 2012 injuries, and her symptoms at the time neither indicated nor necessitated the need for an MRI. Furthermore, although Ms. Correia's pain ratings did not change much following her surgery, Dr. Blanda explained that patients tend to forget the amount of pain they initially experienced. Finally, despite both parties' competing experts regarding the impact of the collision and her medical treatment thereafter, the jury related all Ms. Correia's medical expenses to the 2013 collision, and no party has challenged this finding on appeal.

Considering the foregoing, and particularly the fact that Ms. Correia endured twenty months of cervical pain before a two-level anterior cervical discectomy and fusion surgery (with approximately a one year recovery), has endured lumbar pain since the collision (and for which surgery may ultimately be performed), and TMJ pain since the cervical surgery, leaving her with a fifty to sixty percent total body disability rating, we find merit in Plaintiff's argument that the trial court was manifestly erroneous in partially denying Ms. Correia's motion for JNOV. Based on the above evidence and the special damages awarded by the jury, the general damages the jury awarded for pain and suffering and permanent disability were abusively low considering the duration of pain and type of treatment Ms. Correia endured. Thus, we reverse the trial court's partial denial of Ms. Correia's motion for JNOV and must now determine the appropriate general damages. Additionally, based on the above evidence and testimony, we also find that the trial court's awards of general damages for loss of enjoyment of life and scarring following its partial grant of JNOV were abusively low. *Pike*, 272 So.3d 943.

"Having found the jury award . . . to be abusively low, this court can only increase the award to 'the lowest amount which is reasonably within the court's discretion.'" *Deligans v. Ace Am. Ins. Co.*, 11-1244, p. 7 (La.App. 3 Cir. 3/7/12), 86

So.3d 109, 115 (quoting *Ryan v. Zurich Am. Ins. Co.*, 07-2312, p. 7 (La. 7/1/08), 988 So.2d 214, 219). In our review of the jurisprudence, we find the following recent cases instructive regarding the general damages involved herein.

This court in *Huntley v. 21st Century Premier Insurance Co.*, 16-514 (La.App. 3 Cir. 11/2/16), 204 So.3d 1085, *writ denied*, 17-148 (La. 3/13/17), 216 So.3d 803, affirmed general damages of $150,000.00 for past and future pain and suffering and $100,000.00 for past and future mental and emotional anguish following injury to the plaintiff's cervical and lumbar spine. *Huntley* involved a low impact automobile accident after which the plaintiff sought treatment for both cervical and lumbar spinal injuries. The plaintiff ultimately had cervical spinal surgery and asserted that she would require a single-level "lumbar laminectomy, discectomy, and fusion with instrumentation" in the future. *Id*. at 1093. The jury awarded past and future medical expenses as well as $150,000.00 in past and future pain and suffering, $100,000.00 in past and future mental and emotional anguish, $25,000.00 in past and future disability, and $25,000.00 in past and future loss of enjoyment of life. The defendant only appealed the pain and suffering and mental and emotional anguish damages. Considering the extensive future lumbar surgery and the previous cervical fusion, this court found no abuse of discretion in those awards.

Further, in 2012 this court found no abuse of discretion in the trial court's increase of a $40,000.00 general damage award by the trial court after it granted a motion for JNOV. *Savant v. Hobby Lobby Stores, Inc.*, 12-447 (La. App. 3 Cir. 11/7/12), 104 So.3d 567. The trial court increased the general damages to $250,000.00 for past, present, and future mental and physical pain and suffering and $100,000.00 for loss of enjoyment of life. In *Savant*, the plaintiff "sought relief via conservative measures such as physical therapy, injections, and chiropractic care. She ultimately underwent two separate surgeries to relieve her neck pain." *Id*. at

19

572. The first surgery was a single level cervical surgery, while the second was a three-level anterior cervical discectomy fusion. The plaintiff also experienced stress due to the limitations her physical condition placed on her ability to interact with her small children and could not participate in a host of activities she could previously.

In *Cobb v. Delta Exports, Inc.*, 05-509, p. 2 (La.App. 3 Cir. 12/30/05), 918 So.2d 1080, 1084, this court affirmed the award of $500,000.00 in general damages (described as "Physical Pain and Suffering, Past and Future Physical Disability") for three surgeries, including a lumbar fusion and a cervical fusion. The plaintiff was involved in a collision between his vehicle and a front-end loader that was removing debris. The plaintiff was unable to return to work, and his physicians remained "skeptical about a permanent return to work." *Id*. at 1091. He continued to experience pain and uses a cane to walk most of the time, which impacted his daily activities. In fact, "[h]is condition is described as a permanent one which will require future pain management." *Id*.

Based on the record, Ms. Correia endured twenty months of cervical and lumbar pain prior to a two-level anterior cervical discectomy and fusion surgery. As of trial, nearly three years post-cervical surgery, she continued to live in pain, requiring pain medication, and with added TMJ issues. Ms. Correia's physicians projected that she will need a two-level lumbar surgery in the future, and she was awarded those medical costs by the jury. Although, unlike *Cobb*, the projection is that Ms. Correia will require two surgeries, one of which she already underwent, both are two-level fusions and Dr. Blanda declared that she had significant total body impairment, fifty to sixty percent. Her cervical injury left her with a scar and with a thirty percent cervical impairment, and Dr. Blanda opined that she additionally experiences a twenty percent lumbar impairment.

Ms. Correia was an active individual prior to this incident. Her injuries have since made it difficult for her to engage in the activities she participated in prior to the incident. Given the nature of Ms. Correia's injuries and the length of time that she has treated and suffered with pain, and especially considering her total body impairment, we find that the lowest amount a fact finder could have reasonably awarded for general damages is $400,000.00.

**CONCLUSION:**

Based on the foregoing, the trial court's partial denial of Ms. Correia's motion for JNOV is reversed. We also find the trial court's award of general damages following its partial grant of the motion for JNOV to be abusively low. Thus, we increase the general damage award to Ms. Correia from a total of $180,000.00 to $400,000.00. The costs of this appeal are assessed to Defendants/Appellees.

**REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART; AND RENDERED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.